IN THE CIRCUIT COURT IN THE 11TH JUDICIAL CIRCUIT
IN AND FOR DADE COUNTY, FLORIDA

Case No.:

GLOBAL NETWORK MANAGEMENT, LTD,
A British Virgin Islands Business Company
Plaintiff

vs.

LEVEL 3 LATIN AMERICAN SOLUTIONS, LLC,
(aka "CENTURY LINK LATIN AMERICAN SOLUTIONS, LLC)
Delaware Limited Liability Company
Defendant

_____/

## COMPLAINT

Plaintiff, GLOBAL NETWORK MANAGEMENT, LTD ("GNM") sues Defendant, LEVEL 3 LATIN AMERICAN SOLUTIONS, LLC, Delaware Limited Liability Company ("LATAM"), and states as follows:

1.       PLAINTIFF brings an action for the damages against DEFENDANT in an amount that is in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of attorneys' fees, costs, prejudgment interest and other expenses and, thus, lies within the jurisdiction of the Court.

2.       GNM, LTD, PLAINTIFF, is a British Virgin Islands Business Company incorporated in the British Virgin Islands with the principle address at P.O. Box 146, Road Town, Tortola, British Virgin Islands.

3.       LEVEL 3 LATIN AMERICAN SOLUTIONS, LLC, Delaware Limited Liability Company whose principally place of business is located in Miami-Dade County, Florida at the address 50 NE 9th Str, 6th floor, Miami, Florida 33132 ("Data Center").

1

Exhibit
2

4.      Venue is proper in Miami-Dade County, Florida because the cause of action alleged herein accrued in Miami-Dade County.

5.      LATAM is the company operating and managing the 6th floor of the Data Center where its customers' equipment is securely stored and maintained.

6.      LATAM also provides other IT related services to businesses.

7.      On July 22, 2014, GNM's predecessor to the contract, Telegram Messenger, LLP signed a master service agreement (MSA 2014) with Level 3 Communiactions GmbH ("Level 3 Germany"). **See Exhibit A.** MSA 2014 controlled the relationship between Telegram Messenger, LLP and Level 3 companies across the world.

8.      On March 6, 2015, Telegram Messenger LLP and LATAM entered a US Addendum Agreement ("US Addendum") which referred to July 22, 2014, Agreement and provided for the services in the United States. **See Exhibit "B."** Telegram Messenger LLP signed the US Addendum and LATAM accepted the terms by performance and course of conduct.

9.      On June 21 and 22, 2017, Telegram Messenger LLP and Level 3 Germany signed a letter of agreement ("LOA") which substituted Telegram Messenger LLP to Telegram Corp., canceled the MSA 2014, and entered an new master service agreement (MSA 2017). **See Exhibit "C."**

10.      On February 12, 2018, Level 3 Germany[1], Telegram Corp, and GNM signed a novation agreement ("Novation Agreement #1"). **See Exhibit "D."** Under the terms of the Novation Agreement #1, GNM became a successor of Telegram Corp. and all rights and duties were assigned to GNM.   GNM agreed to assume all duties under the terms of the contract, and Telegram Corp. was released from the contractual obligations.

---

[1] At that time, CenturyLink acquired Level 3 and all Level 3 companies became CenturyLink.  For convenience and uniformity, the complaint will keep the names of the defendants as "Level 3."

11.   On February 14, 2018, LATAM, GNM, and Telegram Corp. entered a novation agreement ("Novation Agreement #2") where GNM substituted Telegram Corp. in the US Addendum and other orders signed by LATAM and Telegram Corp. **See Exhibit "E."**

12.   As such, GNM and LATAM became bound by the contractual relationship.

13.   On September 20, 2017, GNM ordered 224 computer servers through Super Micro Computer, INC ("SUPER MICRO)" a California corporation. This order was delivered to the Data Center and accepted by LATAM on November 15, 2017[2] ("November Delivery"). Each server in November Delivery contained eight (8) 128 Mb memory cards.

14.   On February 18, 2018, GNM ordered another order of 224 servers through SUPER MICRO. This order was delivered to the Data Center and accepted by LATAM on April 10, 2018 ("April Delivery"). Each server in April Delivery contained eight (8) 128 Mb memory cards.

15.   Notably, GNM also ordered additional servers for its operations in other data centers in Amsterdam and Singapore.  All three shipments shipped to the destinations (Miami, Amsterdam, and Singapore) from the same order and at approximately same time. No incidents with missing memory cards were reported regarding the Amsterdam or Singapore deliveries.

16.   Most of the November Delivery servers were unpacked and installed between November 13 and November 15, 2017, in the cabinets allocated to GNM in the Data Center's 6th floor.

17.   All April Delivery servers were unpacked and installed between April 12 and April 13, 2018, in the cabinets allocated to GNM in the Data Center's 6th floor. In addition, 12 servers left from November Delivery were also installed at that time.

---

[2] This delivery was broken down to two deliveries (the first contained 212 and the other had 12 servers).  The 12 servers were delivered within days after the November 15, 2017, and stored in the Data Center.

18. On or about April 28, 2018, VALDIMIR VEDENEEV, (the CEO of GNM), ("MR. VEDENEEV") arrived to the Data Center for the purpose of completing installation of the servers and preparing them to connect to the network his company operates. At that time, MR. VEDENEEV discovered that some memory cards were missing from the servers.

19. The investigation ensued, and it turned out that about 1,380 memory cards were missing in total from the servers maintained in Data Center.

20. MR. VEDENEEV obtained the reports from SUPER MICRO that showed all memory cards were installed in the servers and functional right before the shipping.

21. Before November and April Deliveries, per normal work relationship with all LEVEL 3 affiliated companies in the world, MR. VEDENEEV hired LATAM employee, DIEGO OUBINA ("MR. OUBINA") LATAM's employee, a manager of operations in the Data Center, to install delivered servers into the cabinets belonging to GNM.

22. MR. VEDENEEV knew that MR. OUBINA used other LATAM employees to provide this service in the past.

23. With such understanding, for both, November and April, Deliveries, MR. VEDENEEV requested that MR. OUBINA again unpack and install the servers into GNM's cabinets on the 6th floor of the Data Center.

24. For April Delivery, MR. OUBINA hired—without MR. VEDENEEV's knowledge, authorization, or consent—outside contractors to do the job ("Contractors").

25. The Data Center has a very vigorous authorization process for employees, non-employees, and customers for entry and equipment access purposes.

26. One needs to go through a modern security system (key access card, security, metal detector, cameras, elevator key pads and so on) in order to enter the Data Center and particularly

the 6th floor of the building.  Even MR. VEDENEEV could not enter the Data Center without first requesting and receiving authorization to do so.

27.    MR. OUBINA, using his position of a manager, let unauthorized Contractors into the Data Center.  GNM had never authorized the Contractors' access to the GNM's equipment and Deliveries.

28.    Unauthorized Contractors, brought by LATAM manager in to the Data Center, installed the GNM Servers in November and April.

29.    In August of 2018, MR. OUBINA left the employ with LATAM.

30.    All conditions precedent to filing this action were complied with or waived.

<div align="center">

**COUNT I**
**BREACH OF CONTRACT (written)**

</div>

31.    PLAINTIFF adopts and realleges the allegations contained in paragraphs 1 through 30 above as if fully and expressly set forth herein, and further alleges as follows:

32.    All conditions precedent to the DEFENDANT'S performance obligations have been fully performed or waived, including but not limited to any performances required by PLAINTIFF.

33.    Under the terms of MSA 2014 and MSA 2017, LATAM provided the services of collocating communications and networking equipment to GNM.

34.    LATAM also provides physical security and housing services to GNM.

35.    LATAM breached the contract by:

    i.    failing to house the GNM's equipment securely;

    ii.    permitting access to the GNM's equipment to unauthorized third-parties;

    iii.    breaching the implied  covenant of good faith and fair dealing

36.   As a direct and proximate result of the aforementioned breach (es) by the DEFENDANT, PLAINTIFF has sustained damages in the amount of $713,460.00 (See the invoice attached herein as **Exhibit "F"),** Installation and replacement costs $8,640.00 ($40 per server x 216 servers), unused rent space due to the breach $49,000.00 (7 spaces x $1,400 (a month) x 5 months), and management fee $77,110.00.  Total damages are $848,210.00.

**WHEREFORE**, PLAINTIFF demands judgment against DEFENDANT for damages, service credit, court costs, prejudgment interest, and any other relief as this Court deems just and proper in order to do justice.

### COUNT II  In Alternative
### NEGLIGENT BAILMENT (IMPLIED CONTRACT)

37.   PLAINTIFF adopts and realleges the allegations contained in paragraphs 1 through 30 above as if fully and expressly set forth herein, and further alleges as follows:

38.   In November of 2017 and April of 2018, GNM delivered, through an independent third party, servers to the Data Center where LATAM provides physical security of the premises.

39.   The Servers' boxes in November delivery had an untempered SUPER MICRO manufacture seal on them.

40.   The Servers' boxes in April delivery had an untempered SUPER MICRO manufacture seal on them.

41.   LATAM employees accepted both deliveries and escorted them to the 6th floor of the Data Center.

42.   LATAM became a Bailee by taking possession of GNM's property ("Bailor").

43.   The bailment created by implied contract was for the mutual benefit of the Bailee and Bailor.

44.     The implied contract referenced above was created by the conduct of the parties and without necessarily spoken or written words. The conduct of both parties was intentional and, each knew or, under the circumstances, should have known, that the parties would understand the conduct as creating a contract.

45.     Specifically, the terms of the contract inferred from the conduct of the parties and the circumstances would include that GNM pays for storage, infrastructure expenses, housing, security, and electricity for the Servers to be provided by LATAM. Under the circumstances, both GNM and LATAM understood and intended that compensation was to be paid to reimburse LATAM for its maintenance and other services listed ("Services") regarding GNM's Servers.

46.     Having received something of value, more specifically the monies for the Services, LATAM impliedly promised to securely house and maintain the Servers.

47.     LATAM, Bailee, failed to exercise ordinary and reasonable care regarding PLAINTIFF's property or, alternatively, cannot reasonably explain how GNM's property went missing or got stolen.

48.     GNM demanded LATAM return GNM's property.

49.     LATAM, Bailee, failed to return the demanded GNM property.

50.     LATAM, Bailee, caused PLAINTIFF's property to be lost, stolen, or destroyed by failing to exercise ordinary and reasonable care over the items or alternatively cannot reasonably explain how GNM's property went missing or got stolen.

51.     PLAINTIFF has been directly damaged by DEFENDANT's actions or omissions.

**WHEREFORE**, PLAINTIFF demands judgment against DEFENDANT for damages, service credit, court costs, prejudgment interest, and any other relief as this Court deems just and proper in order to do justice.

## COUNT III  – In Alternative
## BREACH OF CONTRACT (IMPLIED IN FACT)

52.      PLAINTIFF adopts and realleges the allegations contained in paragraphs 1 through 30 above as if fully and expressly set forth herein, and further alleges as follows:

53.      The contract between the parties was created by the conduct of the parties and without necessarily spoken or written words. The conduct of both parties was intentional and, each knew or under the circumstances should have known, that the parties would understand the conduct as creating a contract.

54.      Specifically, the terms of the contract inferred from the conduct of the parties and the circumstances would include that GNM pays for storage, infrastructure expenses, housing, security, and electricity for the Servers. Under the circumstances, both GNM and LATAM understood and intended that compensation was to be paid to reimburse LATAM for Services regarding GNM's Servers.

55.      Having received something of value, more specifically the monies for the services, LATAM impliedly promised to securely house and maintain the Servers.

56.      LATAM failed its promise to securely house the GNM's servers because 1,380 memory cards disappeared from the Data Center controlled by LATAM which was a direct and proximate cause for the GNM's damages.

57.      This is a breach of a contract implied in fact. By reason of the breach, GNM has been damaged.

**WHEREFORE**, GNM demands judgment against LATAM for damages, service credit, court costs, prejudgment interest, and any other relief as this Court deems just and proper in order to do justice.

## DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands trial by jury of all issues so triable as of right by a jury.

## PUNITIVE DAMAGES

PLAINTIFF reserves the right to amend the complaint to include the punitive damages.

Dated on: December 31, 2019

<div style="margin-left: 40%;">

ShamayevLaw, P.A.
Stanislav A Shamayev, ESQ
Attorney for Plaintiff
601 S Federal Highway
Hollywood, FL 33020
Telephone: (954) 361-1222
Facsimile:  (954) 272-7535
sshamayev@shamayevlaw.com

</div>

By:    /s/ Stanislav A Shamayev
           Stanislav A Shamayev, ESQ
           Florida Bar No. 118908

# Exhibit A



# MASTER SERVICE AGREEMENT

This Master Service Agreement ("Agreement") is made this __22__ day of ___July___ 2014 between

**Telegram Messenger LLP**, Suite 2, 23-24 Great James Street, London WC1N 3ES (registered in England and Wales under number OC391410) ("Customer")

and

**Level 3 Communications GmbH**, Rüsselsheimer Strasse 22, 60326 Frankfurt am Main, Germany (registered at Amtsgericht Frankfurt am Main under HRB 43850, USt-IdNr. DE 195 395 583) („Level 3").

This Agreement provides the general terms and conditions applicable to Customer's purchase of all communications and other services ("Service") from Level 3 based on individually agreed Customer Orders (as defined below). The scope of the Services is defined in Service Schedules applicable to the respective Service. The applicability of any deviating terms is excluded, even in the case that Level 3 provides the Services and does not expressly contradict such terms.

## ARTICLE 1. ORDERS FOR AND DELIVERY OF SERVICE; CONTRACT TERM

1.1    **Submission and Acceptance of Customer Order(s); Contract Term**. Customer may submit individual requests for Service in a form designated by Level 3 ("Customer Order"). Customer Orders shall contain the duration for which Service is ordered ("Service Term"), a description of the Service, and the applicable non-recurring charges ("NRC") and monthly recurring charges ("MRC") for the Service. The Service Term starts with the date of the billing commencement according to Article 2.1 below. Service will continue on a month to month basis at the expiration of the Service Term at Level 3's then current rates, until terminated by either party upon 30 days' prior written or electronic notice to the other party to the end of the Service Term or to the end of a prolongation month. Level 3 will notify Customer of acceptance of the Customer Order by delivering (in writing or electronically) the date by which Level 3 will install Service (the "Customer Commit Date") or by delivering the Service. Renewal Customer Orders will be accepted by Level 3's continuation of Service. If Customer submits Customer Orders electronically, Customer shall assure that any passwords or access devices are available only to those having authority to submit Customer Orders. Customer will pay Level 3's then current charges for moves, adds or changes agreed to by Level 3 in respect of any Customer Order or Service.

1.2    **Credit Approval and Deposits**. Customer will provide Level 3 with credit information as requested and delivery of Service is subject to credit approval by Level 3. Level 3 may require Customer to make a deposit as a condition of Level 3's acceptance of any Customer Order or continuation of: a) usage-based Services; or b) non-usage based Services where Customer fails to timely pay Level 3 hereunder or Level 3 reasonably determines that Customer has had an adverse change in financial condition. Deposits will not exceed 2 months' estimated charges for Service and are due upon Level 3's written request. When Service is discontinued, the deposit will be credited to Customer's account and the balance refunded.

1.3    **Customer Premises; Level 3 Equipment**. If access to non-Level 3 facilities is required for the installation, maintenance, grooming, movement, upgrade and/or removal of Level 3 equipment, Customer shall, at its expense, secure such right of access and shall arrange for the provision and maintenance of power and heating, ventilation and air condition ("HVAC") as needed for the proper operation of such equipment. Title to equipment (including software) provided by Level 3 remains with Level 3. Customer will not, and will not permit others to (a) disconnect, repair or tamper in any way with Level 3's equipment and (b) create or permit to be created any encumbrances on Level 3's equipment.

1.4    **Scheduled Maintenance and Local Access**. Scheduled maintenance will not normally result in Service interruption. If scheduled maintenance requires Service interruption, Level 3 will: (i) provide Customer 7 days' prior written notice, (ii) work with Customer to minimize such interruptions and (iii) use commercially reasonable efforts to perform such maintenance between midnight and 6:00 a.m. local time in the country where the Service is provided to Customer.
If third party local access services obtained by Customer are involved in or connected to the Services, Customer will: (i) provide Level 3 with circuit facility and firm order commitment information and design layout records to enable cross-connects to Level 3 Service(s) (provided by Level 3 subject to applicable charges), (ii) cooperate with Level 3 (including but not limited to changing/determining demarcation points and/or equipment and providing necessary letters of authorisations) in respect of circuit grooming or re-provisioning, and (iii) where a related Service is disconnected, provide Level 3 a written disconnection firm order commitment from the relevant third party provider.
Level 3 may re-provision any local access circuits obtained by Level 3 from one off-net provider to another or to the Level 3 owned and operated network (on-net), and such changes shall be treated as scheduled maintenance, provided that Level 3 shall provide Customer 30 days' notice of such activity.

## ARTICLE 2. BILLING AND PAYMENT

2.1    **Commencement of Billing**. Level 3 will deliver a written or electronic notice to Customer when Service is installed, has been tested and is functioning properly (a "Connection Notice") at which time billing will commence ("Service



Commencement Date"). If Customer notifies Level 3 within 3 business days after delivery of the Connection Notice that Service is not functioning properly, Level 3 will correct any deficiencies and, upon Customer's request, credit Customer's account in the amount of 1/30 of the applicable monthly recurring charges (MRC) for each day the Service did not function properly. If Level 3 cannot complete installation due to Customer delay or inaction, Level 3 may begin charging Customer for the Service and Customer shall pay such charges which will appear on Customer's first invoice following the Service Commencement Date.

2.2    **Payment of Invoices and Disputes.** Invoices are delivered monthly and due immediately, i.e. to be paid within 30 days after the invoice date. Fixed charges are billed in advance and usage-based charges are billed in arrears. Billing for partial months is prorated. Past due amounts bear interest at 1.5% per month or the highest rate allowed by law (whichever is less). Customer is responsible for all charges in respect of the Service attributable to him, even if incurred as the result of unauthorized use. If Customer reasonably disputes an invoice, Customer must pay the undisputed amount and submit written notice of the disputed amount (with details of the nature of the dispute and the Services and invoice(s) disputed). Disputes must be submitted in writing within 90 days from the date of the invoice. If the dispute is resolved against Customer, Customer shall pay such amounts plus interest from the date originally due.

2.3    **Taxes and Fees.** Excluding taxes based on Level 3's net income, Customer is responsible for all taxes and fees arising in any jurisdiction imposed on or incident to the provision, sale or use of Service, including but not limited to value added, consumption, sales, use, gross receipts, withholding, excise, access, bypass, ad valorem, franchise or other taxes, fees, duties or surcharges (including regulatory surcharges), whether imposed on Level 3 or a Level 3 affiliate, along with similar charges stated in a Customer Order (collectively "Taxes and Fees). Charges for Service are exclusive of Taxes and Fees. Some Taxes and Fees and the costs of administering the same, are recovered through imposition of a percentage surcharge(s) on the charges for Service. If Customer is required by law to make any deduction or withholding of withholding Taxes from any payment due hereunder to Level 3, then, notwithstanding anything to the contrary contained in this Agreement, the gross amount payable by Customer shall be increased so that, after any such deduction or withholding for such withholding Taxes, the net amount received by Level 3 will not be less than Level 3 would have received had no such deduction or withholding been required. Customer may present Level 3 with an exemption certificate eliminating Level 3's liability to pay certain Taxes and Fees; Level 3 will give effect thereto prospectively.

2.4    **Regulatory and Legal Changes.** If changes in applicable law, regulation, rule or order materially affect delivery of Service, the parties will negotiate appropriate changes to this Agreement. If the parties cannot reach agreement within 30 days after Level 3's notice requesting renegotiation: (a) Level 3 may, on a prospective basis after such 30 days period, pass any increased delivery costs on to Customer and (b) if Level 3 does so, Customer may terminate the affected Service on notice to Level 3 delivered within 30 days.

2.5    Cancellation and Termination Charges.

(A)    If Customer declares that he wishes to cancel a Customer Order (or portion thereof) **prior** to the delivery of a Connection Notice for reasons not attributable to Level 3, Level 3 may agree to a cancellation of the affected Customer Order and Service, subject to the Customer agreeing to pay Level 3 a cancellation charge equal to the sum of: (i) for "off-net" Service, any third party termination charges for the cancelled Service; (ii) for "on-net" Service, 1 month's monthly recurring charges for the cancelled Service; (iii) the non-recurring charges for the cancelled Service; and (iv) Level 3's out of pocket costs (if any) incurred in constructing facilities necessary for Service delivery.

(B)    If Customer declares that he wishes to terminate any Service(s) **after** the delivery of a Connection Notice but prior to the end of the Service Term for reasons not attributable to Level 3, Level 3 may agree to a premature termination effective upon expiry of 30 days from receipt of the Customer declaration, subject to the Customer agreeing to pay a cancellation charge equal to the sum of: (i) all unpaid amounts for Service actually provided ; (ii) 100% of the remaining monthly recurring charges for months 1-12 of the Service Term; (iii) 50% of the remaining monthly recurring charges for month 13 through the end of the Service Term and (iv) if not recovered by the foregoing, any termination liability payable to third parties resulting from the termination, and any out of pocket costs of construction to the extent such construction was undertaken to provide Service hereunder.

(C)    If Service is terminated by Level 3 as the result of Customer's default, Customer shall pay Level 3 a termination charge equal to the sum of: (i) all unpaid amounts for Service actually provided ; (ii) 100% of the remaining monthly recurring charges for months 1-12 of the Service Term; (iii) 50% of the remaining monthly recurring charges for month 13 through the end of the Service Term and (iv) if not recovered by the foregoing, any termination liability payable to third parties resulting from the termination. Customer acknowledges that the charges in this Section are a genuine estimate of Level 3's actual damages and are not a penalty. In the event the charges in this Section have to be paid due to Level 3 having terminated the Service as the result of an uncured default by Customer, then Customer shall retain the right to prove lower damages while Level 3 has the right to prove higher damages.

## ARTICLE 3. DEFAULT

3.1    Termination. If (A) Customer fails to make any payment when due and such failure continues for 5 business days after written notice from Level 3, or (B) either party commits a material breach of this Agreement and such breach continues for 30 days after written notice from the other party, or (C) either party is unable to pay its debts or enters into liquidation (except for the purposes of a solvent amalgamation or reconstruction) or makes an arrangement with its creditors or

Level 3 _____    Customer PD _____



becomes subject to an administration order or a receiver or administrative receiver is appointed over all or any of its assets, or ceases or threatens to cease carrying on its business or is dissolved or any equivalent procedure in any other jurisdiction occurs in relation to that party, then the non-defaulting party may, upon written notice terminate this Agreement and/or any Customer Order, in whole or in part. The termination is without prejudice to any other remedies the terminating party may have under this Agreement or applicable law.

3.2   **Suspension**. If Level 3 is entitled to terminate this Agreement and/or a Customer Order in accordance with 3.1 (A), 3.1 (B) or 3.1 (C) above, Level 3 may suspend, in whole or in part, Customer's Services, without prejudice to Level 3's right to terminate this Agreement or any Customer Order, and to Level 3's other remedies under applicable law. Customer shall remain liable to pay all charges in respect of the suspended Service(s) during any period of suspension.

<u>ARTICLE 4. LIABILITIES AND SERVICE LEVELS</u>

4.1   <u>Limitation of Liability</u>.

(A)   Level 3 will only be liable for damages (including non-contractual liability), regardless of the legal grounds, which have been caused by gross negligence or intent, by culpable violation of essential contractual duties or cardinal duties, or by lack of guaranteed qualities. An essential contractual duty or cardinal duty is a duty the fulfilment of which enables the proper performance of the contract in the first place (e.g. the provision of the Service), or the violation of which endangers the achievement of the purpose of the Agreement, and the compliance with which Customer may typically rely upon.

(B)   Level 3's liability for violations of essential contractual duties or cardinal duties due to slight or simple negligence shall be limited to the amount of the typically foreseeable damages. Any liability for violations of any other contractual duties due to slight or simple negligence is excluded.

(C)   If in connection with the provision of telecommunication services Customer is not an end user, but a provider of telecommunication services, Level 3's liability towards the Customer for pecuniary damages caused by negligence to Customer's end users shall not exceed the statutory liability pursuant to the TKG (*Telekommunikationsgesetz*).

(D)   Level 3 shall not be liable for special, exemplary or punitive damages. Any liability of Level 3 for consequential or indirect damages (including but not limited to damages for lost profits (whether directly or indirectly), loss of revenues, business goodwill, anticipated savings, customers, data, arising out of interference with business and other indirect, incidental, or consequential damages) arising out of or in connection with this Agreement or any Customer Order or any other cause whatsoever, is excluded, unless the damage was caused by intent.

(E)   Furthermore, Level 3 shall not be liable for damages to the extent that the Customer could have prevented the damage by taking appropriate measures, in particular by program and data security measures, provision of proper training to the respective users as well as safeguarding by way of back-up procedures. Damage compensation for the restoration of destroyed or lost data shall be limited to the cost of reproducing such data from back-up copies made by the Customer.

(F)   The foregoing limitations of liability shall also inure to the benefit of the employees of Level 3 and any affiliates of Level 3 involved in the performance of this Service Agreement and/or any Customer Order as well as their respective employees.

(G)   The foregoing limitations of liability shall not apply insofar as Level 3 is held liable under the Product Liability Act or under principles of manufacturer's liability. In all other respects, in particular in respect of strict liability regardless of negligence or intent ("*verschuldensunabhängige Garantiehaftung*"), Level 3's liability is excluded.

4.2   <u>Unlimited Liability</u>. Nothing in this Agreement shall be construed as limiting the liability of either party for, (a) personal injury or death resulting from the negligence or intent of a party or its employees, (b) for fraud or fraudulent misrepresentation by a party or its employees, (c) breach of Article 5.8 (Confidentiality), and (d) any liability of either party which cannot be limited or excluded by law.

4.3   <u>Service Levels</u>.

(A)   The "Service Level" commitments applicable to Services are contained in the Service Schedules for each Service. If Level 3 does not meet a Service Level and is accountable for such failure (see also Article 4.7 below), a credit will be issued to Customer as stated in the applicable Service Schedule on Customer's request. Level 3's maintenance log and trouble ticketing systems are used to calculate Service Level events. To request a credit, Customer must contact Level 3 Customer Service (contact information is located at www.level3.com) or deliver a written request (with sufficient detail to identify the affected Service) within 60 days after the end of the month in which the event occurred. Total monthly credits will never exceed the charges for the affected Service for that month.

(B)   Save where the Customer has the right to terminate this Agreement in accordance with Article 3.1, Customer's sole remedies for any non-performance, outages, failures to deliver or defects in Service are contained in (i) the Service Levels and chronic outage provisions (if any) applicable to the affected Service, and (ii) Article 4.5 below. Level 3's liability pursuant to Article 4.1 and 4.2 remains unaffected.

Level 3 _____   Customer PD



**4.4** **Liability Limitation**. Subject to Article 4.1 (C) and (G), 4.2 and 4.3, Level 3's total aggregate liability in respect of any claim, whether arising from contractual or non-contractual liability or otherwise under or in connection with this Agreement shall in no event exceed 100% of all charges paid during the 12 month period immediately prior to which the relevant claim arises.

**4.5** **Right of Termination for Installation Delay**. Instead of installation Service Level credits, if Level 3's installation of Service is delayed by more than 30 business days beyond the Customer Commit Date, Customer may terminate the affected Service without liability upon written notice to Level 3, provided such written notice is delivered prior to Level 3 delivering a Connection Notice for the affected Service. This Section shall not apply where Level 3 is constructing facilities to a new location not previously served by Level 3.

**4.6** **Disclaimer of Warranties**. Level 3 makes no warranties or representations, express or implied, either in fact or by operation of law, statutory or otherwise, including warranties of merchantability or fitness for a particular use, except those expressly set forth in this Agreement or any applicable Service Schedule.

**4.7** **Accountability (*„Vertretenmüssen"*)**. Level 3 cannot be made accountable for the following impairments of performance: (i) Any default, non-availability, delay or other quality degradation of the Service caused by events of force majeure according to Article 5.1; (ii) impairments of performance for which the customer is accountable for or caused by equipment or power supply services provided by the customer; (iii) impairments of performance attributed to scheduled maintenance according to Article 1.4; and (iv) any default, non-availability, delay or other quality degradation of the Service caused by third parties (except suppliers of Level 3 – but especially other carriers or network interconnection points controlled by third parties, equipment or power supply services provided by third parties, or cable cuts caused by third parties). All these events under (i) to (iv) are considered "Excused Outages".

## ARTICLE 5. GENERAL TERMS

**5.1** **Force Majeure**. Neither party shall be liable, nor shall any credit allowance or other remedy be extended, for any failure of performance or equipment due to causes beyond such party's reasonable control ("force majeure event"). In the event Level 3 is unable to deliver Service as a result of a force majeure event, Customer shall not be obligated to pay Level 3 for the affected Service for the duration of the event.

**5.2** **Assignment and Resale**. Customer may not assign its rights or obligations under this Agreement or any Customer Order without the prior written consent of Level 3, which will not be unreasonably withheld. Level 3 may, after having given prior written notice to the Customer, assign and transfer any or all of its rights and obligations under this Agreement to an affiliate of Level 3. This Agreement shall apply to any permitted transferees or assignees. Unless otherwise provided in a Service Schedule but always subject to applicable sanctions and export control regulations, Customer may provide Service to third parties or use the Services in connection with goods or services by Customer to third parties ("Customer Provided Services") provided that Customer shall indemnify, defend and hold Level 3 and its affiliates harmless from any claims arising from or related to any Customer Provided Services. If Customer sells telecommunications services, Customer warrants that it has and will at all times have the requisite authority with appropriate regulatory agencies in respect of the same. Nothing in this Agreement, express or implied, confers upon any third party any right, benefit or remedy under or by reason of this Agreement.

**5.3** **Affiliates**. Service may be provided to Customer by an affiliate of Level 3, and Level 3 may use third parties to provide certain aspects of the Service, but Level 3 shall remain responsible to Customer for the delivery and performance of the Service.
Customer's affiliates may purchase Service pursuant to this Agreement and Customer shall be jointly and severally liable for all claims and liabilities related to Service ordered by any Customer affiliate.

**5.4** **Notices**. Notices shall be in writing and will be delivered personally, or sent by first class post, or by facsimile, pre-paid overnight courier, or electronic mail (if an e-mail address is provided), addressed as follows:

If to Level 3:

    Level 3 Communications GmbH
    Rüsselsheimer Strasse 22, 60326 Frankfurt am Main
    Germany
    Attn: Corporate Counsel
    Fax: +49 (69) 5060-8207

If to Customer:

Telegram Messenger LLP
Suite 2, 23-24 Great James Street
London WC1N 3ES

For billing inquiries/disputes and requests for Service Level credits: by filing a Credit Request via the MyLevel3 customer portal or via email to Billing@Level3.com.

    Alternatively:
    Level 3 Communications Limited
    7th Floor, 10 Fleet Place
    London, EC4M 7RB, United Kingdom

Level 3 _____  Customer 



Attn: Dir, Customer Care & Billing

For requests for disconnection of Service (for other than default):

By submitting the disconnect request using the MyLevel3 customer portal or submitting it to Disconnects@Level3.com.

If no Customer address is provided above, notices may be provided to any electronic or physical address identified on the Customer Order. Either party may change its notice address upon notice to the other party. All notices shall be deemed given on (i) the date delivered if delivered personally, by facsimile or e-mail (or the next business day if delivered on a weekend or legal holiday), (ii) the business day after dispatch if sent by overnight courier, or (iii) the third business day after dispatch if sent by Post.

**5.5    Acceptable Use / Privacy Policy.** Customer's use of Service shall comply with Level 3's Acceptable Use Policy and Privacy Policy, as communicated in writing to Customer and which are also available through Level 3's web site (www. http://www.level3.com/en/network-security/acceptable-use-policy/ and http://www.level3.com/en/privacy/ respectively). Level 3 will communicate changes in the Acceptable Usage Policy and Private Policy to Customer in writing from time to time. Such changes will become binding, unless Customer objects to such changes within a period of one week after receipt of Level 3's information regarding the changes.

**5.6    Data Protection.** In this Agreement, the words 'data processor', 'data controller', 'personal data' and 'traffic data' shall have the meanings set out in the applicable data privacy laws and regulations.

(A)    During the performance of this Agreement, it may be necessary for Level 3 to collect ("*Erheben*"), process ("*Verarbeiten*") and use ("*Nutzen*") billing, utilization, traffic and other data necessary for the operation of its network and for the performance of its obligations under this Agreement. In the event Level 3 has access to and otherwise processes personal data, Customer agrees that Level 3 (or its affiliates) may use ("*Verwenden*") such data and other Customer data, in accordance with applicable law and regulation, for the performance of Level 3's obligations and the exercise of Level 3's rights under this Agreement.

(B)    Where the Services include Level 3 Managed Security Services, Level 3 will, notwithstanding Article 5.6 (D) below, also collect and process traffic data to provide the Services and improve the performance of those Services over time. Customer may withdraw consent to the processing of traffic data under this Article 5.6 (B) at any time by serving notice of termination to those Services in accordance with Article 2.5.

(C)    The parties hereby agree that, in order for Level 3 to perform its obligations under this Agreement, it may be necessary for Level 3 to transfer, process and store data outside the European Economic Area ("EEA") including to the United States; Level 3's rights and obligations pursuant to Article 5.6 (A) above remain unaffected. Customer hereby agrees that nothing in this Agreement will prevent Level 3 carrying out any data processing operations (including but not limited to the retention and disclosure of data) in order for Level 3 to comply with applicable law or regulatory obligations. Where Level 3 provides Service as Customer's data processor, Customer authorizes Level 3 to enter into Standard Contractual Clauses (in the form adopted by decision 2010/87/EU of 5 February 2012 and with Appendices in the form set out in the Data Protection Schedule to this Agreement) with its Level 3 affiliate(s) on Customer's behalf and in Customer's name in order to provide adequate protection for such personal data.

(D)    Level 3 may provide Customer with Services (for example, call recording features related to Collaboration Services or Managed Security Services) as Customer's data processor. Where this is the case, Level 3 will (i) process personal data only in accordance with Customer's lawful instructions, including as set out in this Agreement, (ii) implement appropriate technical and organisational measures to protect personal data against accidental or unlawful destruction or accidental loss, alteration or unauthorised disclosure or access, (iii) notify Customer promptly if it becomes aware of any actual or attempted breach of this Article 5.6 (D) and, thereafter, take such steps as Customer may reasonably require, within the timescales reasonably required by Customer to remediate such breach of this Article 5.6 (D), and provide such additional information relating to such breach as Customer may reasonably require; and (iv) refer to Customer any requests, notices or other communication from data subjects, data protection authorities or any other law enforcement authority, for the Customer to resolve, to the extent permitted by applicable law. Where required, Level 3 and Customer shall conclude a separate data processing agreement in accordance with applicable law.

**5.7    Intellectual Property and Publicity.** Neither party is granted a license or other right (express, implied or otherwise) to use any trademarks, copyrights, service marks, trade names, patents, trade secrets or other form of intellectual property of the other party or its affiliates without the express prior written authorization of the other party. Neither party shall issue any press release or other public statement relating to this Agreement, except as may be required by law or agreed between the parties in writing.

**5.8    Confidentiality.** Either party may disclose (Disclosing Party) to the other party (Receiving Party) Confidential Information of the Disclosing Party. 'Confidential Information' means without limitation, any information which is identified as confidential at the time of disclosure, the content of this Agreement and any information which ought reasonably to be regarded as confidential. Confidential information does not include information that: (a) is in the possession of the Receiving Party without any obligation of confidentiality prior to disclosure by the Disclosing Party; (b) is published or becomes

Level 3 _____    Customer  PD



available to others, without restriction and without breach of this Agreement by the Receiving Party; (c) becomes available to the Receiving Party from others who are not in breach of any obligation of confidence; and (d) is developed by the Receiving Party independent of and without use of the Confidential Information. The Receiving Party shall; (i) use Confidential Information only to perform its obligations under this Agreement; (ii) not disclose the Confidential Information without the prior written consent of the Disclosing Party, other than to its employees, Affiliates, consultants, subcontractors and advisors who have a need to know and are bound by similar confidentiality obligations; and (iii) protect Confidential Information in the same manner as it protects its own confidential information. The obligations under this Section 5.8 shall continue for a period of two (2) years after termination or expiry of the Agreement.

5.9   **Governing Law; Amendment**. This Agreement, the Service Schedule(s), all Customer Order(s) executed hereunder and any dispute or claim arising out of it or in connection with them or their subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the laws of the Federal Republic of Germany, without regard to its choice of law rules. Legal venue is Frankfurt am Main. Level 3 remains entitled to bring action against the Customer at any competent court. This Agreement, including any Service Schedule(s) and Customer Order(s) executed hereunder, constitutes the entire and final agreement and understanding between the parties with respect to the Service and supersedes all prior written or oral agreement(s) relating to the Service. This Agreement may only be modified or supplemented by an instrument executed by an authorized representative of each party. No failure by either party to enforce any right(s) hereunder shall constitute a waiver of such right(s).

5.10   **Order of Precedence**. In the event of any conflict between this Agreement and the Terms of any Service Schedule and/or Customer Order, the order of precedence is as follows: (1) the Service Schedule, (2) this Agreement, and (3) the Customer Order.

5.11   **Latin American Services**. With respect to Latin American Services, Customer agrees that it (or its local affiliate) will enter into a separate local country addendum/agreement (as approved by local authorities) ("LCA") with the respective Level 3 affiliate which provides the local Service(s), and such Level 3 affiliate will invoice the Customer (or its local affiliate) party to the LCA for the respective local Service(s). For the purposes of this Agreement "Latin American Services" means any transport or telecommunications service where either or both of the originating or terminating end points of the traffic is located in any of Brazil, Argentina, Venezuela, Peru, Chile, Mexico, Panama and/or any other country (and their respective territorial waters) in Latin America in which Level 3 is licensed to provide services.

5.12   **Subcontracting**. Level 3 may, without consent, subcontract the provision of a Service, or a portion of a Service, provided that Level 3 will continue to be liable for the performance of such subcontractors in accordance with the terms of this Agreement.

5.13   **Relationship; Third Parties and Counterparts**. The relationship between the parties is not that of partners, agents, or joint venturers. Nothing in this Agreement shall confer upon any third party any right, benefit or remedy of any nature under this Agreement. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one instrument. Digital signatures and electronically exchanged copies of signed documents shall be sufficient to bind the parties to this Agreement.

5.14   **Dispute Resolution Proceedings Before the National Regulatory Authority ("*Bundesnetzagentur*")**. If the Customer wishes to institute conciliation proceedings to settle any dispute between Level 3 and the Customer as to whether Level 3 has fulfilled its obligations vis-à-vis the Customer in accordance with the provisions of the German Telecommunications Act, the Customer may address a request to that effect to the Bundesnetzagentur in Bonn. Further details are available on the Website of Bundesnetzagentur: www.bundesnetzagentur.de.

5.15   **Severability**. If any provision of this Agreement shall be declared invalid or unenforceable under applicable law, said provision shall be ineffective only to the extent of such declaration and such declaration shall not affect the remaining provisions of this Agreement. In the event that a material and fundamental provision of this Agreement is declared invalid or unenforceable under applicable law, the parties shall negotiate in good faith respecting an amendment hereto that would preserve, to the fullest extent possible, the respective rights and obligations imposed on each party under this Agreement as originally executed.

Level 3 Communications GmbH                    Telegram Messenger LLP

Signature: _____            Signature: _Dyub_____

Name: _____            Name: _Pavel Durov_____

Title: _____            Title: _CEO_____

Date: _____            Date: _22.07.2014_____



## SERVICE SCHEDULE
## LEVEL 3 HIGH SPEED IP SERVICE

1.   **Applicability**. This Service Schedule forms part of the Master Service Agreement between Level 3 and Customer ("Agreement") and is applicable only where Customer orders Level 3® High Speed IP Service (the "Service"). Level 3 provisions the Service on two networks, identified as: **AS 3356 (Level 3)** and/or **AS 3549 (Global Crossing)**. Level 3 High Speed IP Service may be designated as IP Transit Service or (3)CrossRoads Service in customer orders, order acceptance, service delivery, billing (and related) documents.

2.   **Definitions**. Any capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement. The following terms are defined for the purposes of this Service Schedule:

(A)   "Back-Up Port" shall mean any Level 3 High Speed IP Service port other than the Primary Port that is configured to send/receive traffic only in the event that the applicable Primary Port becomes unavailable to send or receive traffic. The Back-Up Port must be identified as such in the Customer Order and provisioned on a Level 3 router or switch (within the same Level 3 Facility) that is separate from the Primary Port.

(B)   "Committed Data Rate" shall mean the minimum data rate committed by Customer and set forth in the Customer Order (expressed in Megabits per second (Mbps)).

(C)   "IP Fiber Extension" shall mean a dark fiber local access solution for Level 3 High Speed IP Service between the Level 3 Gateway and the Customer Premises (or such other point of interconnection) in which unprotected IP service is delivered using Level 3 Facilities and Customer facilities, as mutually agreed between the parties. Level 3 shall, in its sole discretion, determine whether Customer may utilize an IP Fiber Extension under this Service Schedule, or must obtain dark fiber pursuant to a separate dark fiber Service Schedule to be executed by the parties.

(D)   "Primary Port" shall mean any Level 3 High Speed IP Service port that is configured to send/receive Customer's Level 3 High Speed IP Service traffic during normal network operations, as identified in the applicable Customer Order.

(E)   "Receive Traffic" shall mean traffic from any origination point that is received by Customer from the Level 3 network.

(F)   "Send Traffic" shall mean traffic from any origination point that is sent by Customer onto the Level 3 network.

3.   **Service Description**. Level 3 High Speed IP Service is an IP transit service (including dedicated IP access port(s)) providing access to the Level 3 IP network and the global Internet. The Service is available through Serial/POS and Ethernet interfaces. The Service is available in a "Standard" configuration or a "Protected" configuration. Standard Service is configured with a single Primary Port and no Backup Port. Protected Service is configured with both a Primary Port and a Backup Port.

4.   **Charges**. Customer may elect to be billed based on a Committed Data or at a Fixed Rate. The manner of billing selected will be set forth in each Customer Order.

(A)   Committed Data Rate charges for the Service consist of four (4) components: (a) a non-recurring installation charge per port; (b) a monthly recurring port charge (if applicable); (c) a monthly recurring charge based on the Committed Data Rate; and (d) monthly usage charges to the extent usage in a particular month exceeds the Committed Data Rate.

The Committed Data Rate shall apply to either a particular Service port or in the aggregate to more than one Service ports provided hereunder, as stated in the applicable Customer Order(s) for such ports. The "Aggregate CDR" billing option (as defined below) is not available for all port interface speeds. The following shall apply (as applicable):

(1)   If the Committed Data Rate applies to a particular Service port, Customer's per port usage of Service (both Send Traffic and Receive Traffic) across such port will be sampled every five (5) minutes for the previous five (5) minute period. At the end of the month, the top five percent (5%) of Send Traffic and Receive Traffic samples for such port shall be discarded. The higher of the resulting ninety-fifth (95th) percentile value for Send Traffic or Receive Traffic for such port will be compared to the Committed Data Rate applicable to the port. If the ninety-fifth (95th) percentile of either Send Traffic or Receive Traffic is higher than the applicable Committed Data Rate, Customer will, in addition to being billed for the Committed Data Rate, be billed at this ninety-fifth (95th) percentile level for any usage in excess of such Committed Data Rate at the contracted-for price per Megabit.

(2)   If the Committed Data Rate applies in the aggregate to more than one Service ports (an "Aggregate CDR") as set forth in the Customer Order for such ports, Customer's usage of Service (both Send Traffic and Receive Traffic) will be sampled every five (5) minutes for the previous five (5) minute period for each such port. At the end of the month, the top five percent (5%) of Send Traffic and Receive Traffic samples shall be discarded for each port. The higher of the resulting 95th percentile value for Send Traffic or Receive Traffic for each such port will be added together to determine Customer's aggregate usage and such aggregate usage will be compared to the Aggregate CDR. If such aggregate usage is higher than the Aggregate CDR, Customer will, in addition to being billed for the Aggregate CDR, be billed for any aggregate

Level 3 _____     Customer _____



usage in excess of the Aggregate CDR at the contracted-for price per Megabit. Unless otherwise agreed in writing by the parties, Aggregate CDRs apply only to the ports listed in the Customer Order. If Customer orders additional ports in a separate subsequent Customer Order(s), the Aggregate CDR stated in the new Customer Order shall be as stated therein for the ports set forth in such Customer Order. Alternatively, if Customer seeks to have the ports previously subject to an Aggregate CDR also contribute to the Aggregate CDR set forth in the new Customer Order(s), the new Customer Order(s) may provide for an increase in the Aggregate CDR for all such ports.

(B)    Fixed Rate charges for Service consist of two (2) components: (a) a non-recurring installation charge per port; and (b) a monthly recurring port charge.

5.    **IP Addresses and Domain Names**. In the event that Level 3 assigns to Customer an IP address as part of the provision of Service, such IP address shall (upon Level 3's request and to the extent permitted by law) revert to Level 3 after termination of the applicable Customer Order for any reason whatsoever, and Customer shall cease using such address. At any time after such termination, Level 3 may re-assign such address to another user. In the event that Level 3 obtains for Customer a domain name (which may be required in some European jurisdictions), Customer shall be the sole owner of such domain name. Customer shall be solely responsible for:

(A)    paying any fees (including renewal fees) relating thereto;

(B)    complying with any legal, technical, administrative, billing or other requirements imposed by the relevant domain name registration authority;

(C)    modifying the mapping of such domain name to a new provider in the event Customer changes service providers; and

(D)    all third party claims (including claims for intellectual property infringement) relating thereto, and Customer shall indemnify and hold Level 3 harmless from all such claims and expenses (including legal fees and court costs) related thereto.

6.    **IP Fiber Extensions**.

(A)    Pursuant to a Customer Order submitted by Customer and accepted by Level 3, the parties may agree that Level 3 will provide Customer with an IP Fiber Extension as part of the local access solution for any Service provided hereunder. Level 3 will invoice Customer, and Customer agrees to pay Level 3, the charges associated with any such IP Fiber Extension as set forth in the applicable Customer Order. Unavailability or degradation of Service caused by or attributable to IP Fiber Extensions shall be considered Excused Outages. The foregoing notwithstanding, Level 3 will use commercially reasonable efforts to respond to any such unavailability or degradation (on any Level 3 Facilities) associated with any IP Fiber Extension within four (4) hours after becoming aware of the same and shall use commercially reasonable efforts to repair traffic-affecting discontinuity within twelve (12) hours after Level 3's representatives arrive at the problem site and have the ability to begin uninterrupted repair activities.

(B)    Level 3 shall have the right to supervise and control in a reasonable manner all activities concerning any IP Fiber Extension provided hereunder, including, without limitation, all Level 3 manholes/handholes. Any work required by Customer in respect of any IP Fiber Extension provided hereunder, including without limitation, (i) splicing the Customer fibers, and (ii) interconnection between the Customer network and the Level 3 network, shall be undertaken only by or (with Level 3's consent) under the supervision of Level 3.

(C)    Prior to delivery of any IP Fiber Extension, Level 3 shall test the dark fiber contained in such IP Fiber Extension in accordance with the then-current version of Level 3's interconnection policies and guidelines.

7.    **Service Levels**.

(A)    **Installation Service Level**. Level 3 will exercise commercially reasonable efforts to install any Service on or before the Customer Commit Date specified for the particular Service. This Installation Service Level shall not apply to Customer Orders that contain incorrect information supplied by Customer or Customer Orders that are altered at Customer's request after submission and acceptance by Level 3. In the event Level 3 does not meet this Installation Service Level for a particular Service for reasons other than an Excused Outage, Customer will be entitled to a service credit for each day of delay equal to either (i) for Service billed on an Aggregate CDR basis, the charges for one (1) day of the pro rata share of the monthly recurring charges ("MRC") associated with the Aggregate CDR for the affected Service port(s) (pro-rated based on the number of total ports that contribute to such Aggregate CDR) or (ii) for Service with any other manner of billing, the charges for one (1) day of the allocated port MRC for the affected Service port(s), in each case up to a monthly maximum credit of ten (10) days.

(B)    **Availability Service Level**. The Availability Service Level for Standard Service is 99.98% and 99.99% for Protected Service. Standard Service is considered unavailable if the Primary Port is unable to send or receive traffic; Protected Service is considered unavailable if both the Primary Port and the Backup Port are unable to send or receive traffic. If credits are due under this Availability Service Level for a particular unavailability event, Service credits will not be payable under Section 7(C) or 7(D) for the same unavailability event.

Level 3 _____    Customer PD



In the event that Service becomes unavailable for reasons other than an Excused Outage, Customer will be entitled to a service credit off of the greater of (i) the port MRC (except for any Service billed on an Aggregate CDR basis) for the affected Service port (if applicable), and (ii) the actual usage charges, if any, (calculated on a Megabit basis at the contracted-for price per Megabit) associated with the affected Service port for the particular month. Service credits, in each case, are based on the cumulative unavailability of the affected Service port in a given calendar month as set forth in the following tables:

For Standard Service:

| Cumulative Unavailability (in hrs:mins:secs) | Service Level Credit |
|---|---|
| 00:00:01 – 00:10:00 | No Credit |
| 00:10:01 – 00:45:00 | 5% |
| 00:45:01 – 04:00:00 | 10% |
| 04:00:01 – 08:00:00 | 20% |
| 08:00:01 – 12:00:00 | 30% |
| 12:00:01 – 16:00:00 | 40% |
| 16:00:01 – 24:00:00 | 50% |
| 24:00:01 or greater | 100% |

For Protected Service:

| Cumulative Unavailability (in hrs:mins:secs) | Service Level Credit |
|---|---|
| 00:00:01 – 00:05:00 | No Credit |
| 00:05:01 – 00:45:00 | 15% |
| 00:45:01 – 04:00:00 | 35% |
| 04:00:01 – 08:00:00 | 50% |
| 08:00:01 – 12:00:00 | 75% |
| 12:00:01 or greater | 100% |

(C)   Delay (Latency). Level 3 commits to average (in a calendar month) latency between the Internet access routers of no more than the latency figures in the table below, depending on which network the Service is provided. If delay exceeds these objectives, except as the result of an Excused Outage, Customer will be entitled to a service credit off of the port MRC for the affected Service port as set forth below:

Note: Although Level 3 has completed its acquisition of Global Crossing, the networks that each company operated have not been fully integrated and as such Services may be ordered and provisioned on either Legacy Level 3 network AS 3356 or Global Crossing network AS 3549. For Services provisioned on Level 3 network (AS3356), the delay measurement is calculated as an average one way latency between Internet routers within each region and between regions connected to AS 3356. For Services provisioned on Global Crossing network (AS 3549), the delay measurement is calculated as an average round trip latency between Internet routers within a region and between regions connected to AS 3549.

| Route | Level 3 AS 3356 (one-way) | Global Crossing AS 3549 (round –trip) |
|---|---|---|
| Within the North American Network [Intra-N. America] | < 25 ms | < 50 ms* |
| European Network to North American Network | < 40 ms | < 80 ms** |
| Within the European Network [Intra-Europe] | <15 ms | < 35 ms |
| Within the Asia Network [Intra-Asia] | N/A | < 110 ms |
| Within the LATAM Network [Intra-LATAM, excluding Mexico City] | N/A | < 120 ms |
| Asian Network to European Network | N/A | < 345 ms** |
| Asian Network to North American Network | N/A | < 185 ms** |
| Asian Network to LATAM Network [excluding Mexico City] | N/A | < 315 ms** |
| European Network to LATAM Network [excl. Mexico City] | N/A | < 210 ms** |
| North American Network to LATAM Network [excl. Mexico City] | N/A | < 140 ms** |
| European Network (South) to Middle East | ≤94 ms | N/A |

* Add 90 ms from/to the Mexico IP Hub on GC network.
** Plus the applicable latency parameter for the region in which the applicable Customer Site is located

| Delay Exceeding Objective | Service Level Credit |
|---|---|
| 1 – 10 ms | 10% |
| 10.1 – 25 ms | 30% |
| 25.1 ms or greater | 50% |

(D)   Packet Delivery. The packet delivery objective is 99.95%. Packet delivery is measured as the average number of IP packets transiting the Level 3 network that are delivered to the intended destination on the Level 3 network. Measurements are over a calendar month, and performance statistics for this SLA can be found on Level 3's customer portal. If packet delivery exceeds these objectives except as the result of an Excused Outage, Customer will be entitled to a service credit off of the port MRC for the affected Service port as set forth below:

| Packet Delivery below Objective | Service Level Credit |
|---|---|
| 99.949% - 99% | 10% |
| 98.99% - 96% | 30% |
| 95.99% or less | 50% |



8.      **Chronic Outage**. Customer may elect to terminate an affected Service prior to the end of the Service Term without termination liability if, for reasons other than an Excused Outage:

(1)      For Standard Service, such Standard Service is unavailable (as defined in Section 7(B) above) in any calendar month for: (a) three (3) or more separate occasions of more than twelve (12) aggregate hours each, OR (b) more than forty two (42) hours in the aggregate; or

(2)      For Protected Service, such Protected Service is unavailable (as defined in Section 7(B) above) in any calendar month for: (a) four (4) or more separate occasions of more than two (2) aggregate hours each, OR (b) more than twenty four (24) hours in the aggregate.

Customer may only terminate such Service that is unavailable as described above, and must exercise its right to terminate the affected Service under this Section, in writing, within thirty (30) days after the event giving rise to a right of termination hereunder, which termination will be effective as set forth by Customer in such notice of termination. Except for any credits that have accrued pursuant to Section 7, this Section 8 sets forth the sole remedy of Customer for chronic outages or interruptions of any Level 3 High Speed IP Service.

9.      **Level 3 arranged Third Party Internet Access**: Upon Customer's request, Level 3 may agree to arrange Internet access using third party providers ("Third Party Internet Access"). Access options vary by country and may include access to the Internet via overbooked and/or non-overbooked connections, DSL technology, private leased circuits (fixed or wireless) and/or Satellite. Specific service details (access type, e.g. downstream/upstream speed, customer premises equipment requirements and number of IP addresses) also differ by country. Third Party Internet Access will, if requested by Customer and accepted by Level 3, be provided by third party subcontractor(s) to Level 3; and, accordingly, is provided on an "as is" basis with the limited service level described below. Customer may report faults and/or outages in Third Party Internet Access to Level 3 on a 24x7 basis and Level 3 will contact the applicable third party service provider to effect restoration. Details of any agreed Third Party Internet Access (including pricing and equipment requirements, if any) will be set out in a Customer Order.

(A)      The *Availability Service Level* for Third Party Internet Access is 98.0%. For Third Party Internet Access (i) Service Availability is defined as the ability of Customer to deliver IP packets from Customer port to any Internet destination and (ii) Service unavailability is defined as periods during which Third Party Internet Access is unavailable. Service unavailability is calculated from the time Level 3 opens a trouble ticket on behalf of Customer until Level 3 closes such trouble ticket.

(B)      *Service Level Credit*. In the event that Third Party Internet Access becomes unavailable for reasons other than an Excused Outage, Customer will be entitled to a service credit as follows. For the first two hour period (or part thereof) of Service unavailability in excess of 14.9 hours, and for each successive one hour period or part thereof, Customer will be entitled to a credit of ten per cent (10.0%) of the applicable MRC for the applicable month. For the purpose of this Section, 'MRC' means the agreed monthly recurring charge for the Third Party Internet Access provided to the Customer which is the subject of the credit claim. The Service Level Credit stated in this Section 9(B) is Customer's sole remedy of Customer for unavailability or interruptions of any Third Party Internet Access.

10.      **Resale Restriction**. Notwithstanding anything to the contrary in the Agreement, Customer is prohibited from reselling any Level 3 High Speed IP Service or any ports provided pursuant to this Service Schedule as a stand-alone wholesale service to a third party without the express written consent of Level 3, provided, however that Customer may bundle any Level 3 High Speed IP Service or any ports provided pursuant to this Service Schedule with any other Level 3 Services or the services of Customer and resell such bundled service to Customer's subscribers and its customers.

11.      **Latin American Services**. With respect to Services provided in Latin America, Customer agrees that it (or its local Affiliate) will enter into a separate local country addendum/agreement (as approved by local authorities) ("LCA") with the respective Level 3 Affiliate which provides the local Service(s), containing terms necessary to comply with local laws/regulations, and such Level 3 Affiliate will invoice the Customer (or its local Affiliate) party to the LCA for the respective local Service(s).



SERVICE SCHEDULE
## LEVEL 3 DATA CENTER FACILITY SERVICES

1.   **Applicability**. This Service Schedule forms part of the Master Service Agreement between Customer and Level 3 ("Agreement"), and is applicable only where Customer orders Level 3® Data Center Facility Services and associated services. Data Center Facility Services may also be designated as Level 3 Colocation in customer orders, order acceptance, service delivery, billing (and related) documents. This Service Schedule is also applicable where Customer orders Level 3® Cross Connect Service and may be designated as Cross Connect Service (or Stand Alone Cross Connect Service) in Customer Orders, order acceptance, service delivery, billing (and related) documents.

2.   **Definitions and Service Description**. Any capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement. Level 3 offers 3 types of "Facilities" for data center colocation (which shall be identified in the Customer Order): Level 3 Premier Elite, Level 3 Premier Select, and Level 3 Premier. In all three types of Facilities, Customer may colocate and install telecommunications equipment and or equipment that manages customer information and applications such as IT computer equipment and servers.

"Colocation Area" shall mean the location within a Level 3 owned or leased Facility in which Space ordered by Customer is located.

"Space" shall mean the location(s) within the Colocation Area where Customer is permitted to colocate communications and networking equipment, as set forth in a Customer Order accepted by Level 3. The types of Space generally offered by Level 3 are (i) Cabinets – a single rack enclosure with locking front and rear doors generally located in a common area of the Colocation Area; and (ii) Private Suites – an area of floor space enclosed by mesh fence or steel partition walls containing cabinets and which is dedicated to a single customer.

"Cross Connect Service" or "Cross Connect" shall mean a copper or fiber optic cabling cross-connected between Level 3 provided Colocation (cabinets, racks, and/or suites), other Level 3 provided Service or Facilities and/or third party provided services or facilities that terminate within the Level 3 Colocation Facility.

"Hot Aisle Cold Aisle" shall mean the arrangement of Customer equipment where the equipment air intake is facing a common aisle ("Cold Aisle"), and the air exhaust of the equipment faces the alternate common aisle ("Hot Aisle"), as designated by Level 3.

"Colocation Environment" shall mean the allowable relative humidity range and maximum allowable temperature in the Colocation Area, specifically as differentiated between Data Center and Network Facilities as set forth in Exhibit A.

"Contracted Square Feet" or "Contracted Square Meter" shall mean, with respect to a Private Suite, the total floor space enclosed within and up to the caged walls of the Private Suite.

3.   **Usage Right**. Customer shall be granted the right to occupy the Space identified in an accepted Customer Order during the Service Term (unless earlier terminated as set forth herein or in the Agreement), subject to the applicable rates set forth in such Customer Order and in accordance with the Agreement and this Service Schedule. At the end of the Service Term, the Space will be provided to Customer on a month-to-month basis at Level 3's then-current prices that Customer agrees to pay by way of continued use of the Space. Level 3 retains the right to access Space for any legitimate business purpose at any time. Nothing herein creates or vests in Customer (or in any other person) any easement, ownership interest, or other property right or interest of any nature in any part of the Facilities, including the Space. Customer expressly disclaims any right, title or interest in, or any perpetual right to use, the Facilities, the Space, and any equipment or other property of Level 3 in the Facilities beyond the rights granted herein.

Customer equipment and third party equipment shall each comply with the Equipment Criteria, a copy of which will be provided to Customer upon request, and if required Customer shall on request demonstrate compliance to the satisfaction of Level 3. Customer shall ensure that Customer equipment and third party equipment are physically segregated, in a manner satisfactory to Level 3, from equipment of Level 3 and equipment of other equipment housing parties.

4.   **Use of and Access to Space**. Customer may only use the Service and the Space for its legitimate corporate business purposes. Placement of Customer equipment in the Space or use of the Service for any other purpose is strictly prohibited. Customer may access the Space 24 hours per day, 7 days per week, subject to any and all rules, regulations and access requirements imposed by Level 3 governing such access at each Facility. At certain locations pre-arranged escorted access may be required.

Access policies and procedures (including procedures for emergency access) vary between Facilities, and will be set out in a Service Manual / Welcome Package which will be provided by Level 3 in respect of each Space in which Level 3 provides the Services to Customer.

If Customer contracts for installation or maintenance by a third party, Customer shall notify Level 3 in writing of the identity of and authorization for its third party. Approval of a nominated third party is within the absolute discretion of Level 3. If approved, the provision of access to such third party maintenance providers shall be subject to these terms and conditions



and the applicable Service Manual / Welcome Package / Facility User Guide and safety, security and access rules of Level 3.

5.      **Level 3 Maintenance**. Level 3 shall perform janitorial services, environmental systems maintenance, power plant maintenance and other actions as are reasonably required to maintain the Colocation Area in a condition that is suitable for the placement of communications and networking equipment. Level 3 shall maintain the Colocation Environment applicable to the Colocation Facility at all times. Level 3 shall in no event be liable for damages pursuant to Sec.536a of the German Civil Code ("Bürgerliches Gesetzbuch – BGB") that have not been caused culpably ("schuldhaft"). Customer shall install equipment in a Hot Aisle Cold Aisle configuration. Customer shall maintain the Space in an orderly and safe condition, and shall return the Space to Level 3 at the conclusion of the Service Term in the same condition (reasonable wear and tear excepted) as when such Space was delivered to Customer. Customer shall not be entitled to any self rectification with respect to any defects of the Service or the Colocation Area. EXCEPT AS EXPRESSLY STATED HEREIN OR IN ANY CUSTOMER ORDER, THE SPACE SHALL BE DELIVERED AND ACCEPTED "AS IS" BY CUSTOMER, AND NO RESPRESENTATION HAS BEEN MADE BY LEVEL 3 AS TO THE FITNESS OF THE SPACE FOR CUSTOMER'S INTENDED PURPOSE.

6.      **Release of Landlord**. If and to the extent that Level 3's underlying leases so require (but only if they so and lawfully require) Customer hereby agrees to release Level 3's landlord (and its agents, subcontractors and employees) from all liability relating to Customer's access to the Colocation Area (and the Facility in which it is located) and Customer's use and/or occupancy of the Colocation Space. Level 3's acceptance of a Service Order by Customer for Data Center Facility Services is consequently subject to the condition precedent of obtaining such release.

7.      **Security**. Level 3 will provide and maintain in working condition card readers, scanners and/or other access devices as selected by Level 3 for access to the Colocation Area. Customer shall under no circumstances bypass the Level 3 security measures for the Facility, Colocation Area or Space. Level 3 will provide a locking mechanism for the Facility, Colocation Area or Space, and Customer shall be solely responsible for locking and/or activating such mechanism, except for Level 3 access pursuant to Clause 3. In the event that unauthorized parties gain access to any Level 3 facility through access cards, keys or other access devices provided to Customer, Customer shall be responsible for any damages caused by such parties, unless Customer can prove that he cannot be held accountable ("Vertretenmüssen") for such damages. Customer shall be responsible for the cost of replacing any security devices lost or stolen after delivery thereof to Customer.

8.      **Rules and Procedures**. Customer shall abide by any posted or otherwise communicated rules including, but not limited to those policies, procedures, and guidelines made available to, posted, or described in the Level 3 Facilities User Guide, Service Manual / Welcome Package / Facility User Guide relating to the use of, access to, or security measures respecting each Level 3 facility.

9.      **Termination of Use**. Level 3 shall have the right to terminate Customer's use of the Space and/or the Service delivered therein in the event that:
(a) Level 3's rights to use the facility in which the Space is located terminates
(b) Customer is in default hereof, including a default in payment by the Customer with a considerable amount;
(c) Customer makes any material alterations to the Space without first obtaining the written consent of Level 3;
(d) Customer allows personnel or contractors access to the Level 3 facilities who have not been approved by Level 3 in advance; or
(e) Customer or any of its agents or employees possess any firearms, illegal drugs or alcohol in a facility or engage in any criminal activity in any facility.
With respect to items (b), (c) and (d), unless (in Level 3's opinion) Customer's actions interfere or have the potential to interfere with other Level 3 customers (in which case termination may be immediate), Level 3 shall take reasonable and commercially prudent steps to provide Customer a written notice and a 10 day opportunity to cure before terminating Customer's rights to use the Space, notwithstanding any longer cure period set forth in the Agreement.

10.      **Removal of Equipment**. Within 10 days following the expiration or termination of the Service Term for any Space, subject to a lien exercised by Level 3, Customer shall remove all Customer equipment or third party equipment from the Space. In the event Customer fails to remove the equipment within such 10 day period, Level 3 may disconnect, remove and dispose of such equipment upon further prior notice of five (5) days. Level 3 may charge Customer and Customer shall pay Level 3's reasonable expenses related to the retention, removal, abandonment or disposal of the Customer equipment and any third party equipment. Customer shall be responsible for any costs and expenses incurred by Level 3, or its agent, representative or contractor, resulting from disconnection, removal, disposal and storage of Customer's or third party's equipment. Level 3 shall not be obligated to release equipment to Customer unless Customer has paid all such costs and expenses and all other charges due and owing by Customer to Level 3 under the Agreement. Level 3 shall not be liable for any loss or damage incurred by Customer arising out of Level 3's disconnection, removal, storage or disposal of Customer's or third party's equipment that has been carried out in accordance with this Clause 10, except where the equipment has been damaged by Level 3's willful acting or gross negligence.

11.      **Sublease**. Customer may sublease the use of Space under the following conditions:
(a) all proposed subleases must be approved in advance and in writing by Level 3 in Level 3's sole discretion, except Customer may sublease the use of Space to an Affiliate of Customer upon prior written notice to Level 3;
(b) all proposed sublessees shall abide by the terms of the Agreement, this Service Schedule and the applicable Customer Order;

Level 3 _____      Customer _____



(c) Customer shall indemnify, defend and hold Level 3 harmless from all loss or damage suffered by Level 3, including claims brought against Level 3 arising from any act or omission of any sublessees or its agents; and

(d) the acts and omissions of any sublessees of Customer shall be attributable to Customer for the purposes of the Agreement and this Service Schedule.

Each client, supplier or other contract partner of Customer is regarded to be an agent or representative of the Customer, all actions and omissions of such third party as well as the use of the Collocation Space or of the Services provided within the framework of this Agreement by such third party shall be attributed to the Customer.

Granting rights of use to third parties does not release the Customer from his obligations according to the Agreement.

In the event Customer subleases use of the Space without Level 3's prior written approval, Level 3 may upon ten (10) days' prior written notice, reclaim the subleased portion of the Space. Customer shall surrender such reclaimed Space and shall be subject to termination charges associated with the reclaimed Space as provided in the Agreement. No refunds shall be made to Customer regarding reclaimed Space.

The placement by Customer of hardware or other equipment (Server Housing) of third parties as well as web hosting by Customer for third parties, who themselves do not have access to the Collocation Space, does not count as the granting of rights of use to third parties within the meaning of this clause.

12.   Changes. Level 3 reserves the right (at Level 3's cost) to change the location or configuration of the Space used by Customer, provided that Level 3 shall not arbitrarily require such changes. Level 3 and Customer shall work in good faith to minimize any disruption in Customer's services that may be caused by such changes in location or configuration of the Space. In the event that Level 3 makes a change to the Space itself that materially and directly impacts Customer's current Colocation Services Customer may terminate the affected Colocation Services without liability. In the event any Customer Order is altered (including, without limitation, any changes in the configuration or build-out of the Space) at Customer's request after Customer's submission and Level 3's acceptance of such Customer Order that results in a delay of Level 3's delivery of such Space, billing for such Space shall commence no later than the original Customer Commit Date.

13.   Insurance. Prior to occupancy by Customer of any Space and during the Service Term, Customer shall procure and maintain the following minimum insurance coverage:

(a) Workers' Compensation in compliance with all applicable statutes of appropriate jurisdiction;

(b) Commercial General Liability with combined single limits of EUR1,000,000 each occurrence; and

(c) "All Risk" Property insurance covering all personal property located by the Customer in the Colocation Area.

Customer acknowledges that it retains the risk of loss for, loss of (including, without limitation, loss of use), or damage to, equipment and other personal property located by or on behalf of the Customer in a Level 3 facility, except the case that Level 3 is liable for such a loss or damage according to Article 4 of the Agreement.

Customer further acknowledges that Level 3's insurance policies do not provide coverage for personal property located by or on behalf of the Customer in a Level 3 facility.

Customer shall furnish Level 3 (or Level 3's written designee) with certificates of insurance demonstrating that Customer has obtained the required insurance coverage prior to use of any Level 3 facility. Such certificates shall contain a statement that the insurance coverage shall not be materially changed or cancelled without at least 30 days' prior written notice to Level 3.

Customer shall require any contractor, customer or other third party entering the Colocation Area on Customer's behalf to procure and maintain the same types, amounts and coverage extensions as required of Customer above.

14.   Storage of Customer Equipment. Level 3 may, at its option, agree to store equipment that Customer intends to colocate in Customer's Space for not more than 45 days prior to the applicable Customer Commit Date. Storage of such equipment is purely incidental to the Service ordered by Customer and Level 3 will not charge Customer a fee for such storage. No document delivered as part of such storage shall be deemed a warehouse receipt. Absent Level 3's gross negligence, intentional misconduct or liability pursuant to Article 4 of the Agreement, Level 3 shall have no liability to Customer or any third party arising from such storage and Customer shall indemnify Level 3 for any claims relating to the same. In the event Customer stores equipment for longer than 45 days, Level 3 may, but shall not be obligated to, return Customer's equipment to Customer without liability, at Customer's sole cost and expense.

15.   Promotional Signage. Customer may display a single promotional sign with Customer's name and/or logo on the outside of any Space; provided such signage does not exceed 20 centimeters by 28 centimeters. All other promotional signage is prohibited.

16.   Cross Connect Services.

(A)   Customer shall be solely responsible for arranging the provision of any services required from any third party with whom it wishes to interconnect. Customer Commit Dates may not be provided for Level 3 Cross Connect Service, in which case service delivery shall constitute Level 3's acceptance.

(B)   Interconnection. Unless otherwise agreed between the parties, any Level 3 Cross Connect Service will be interconnected to a Level 3 provided panel within the Level 3 Facility (and not directly to Customer provided equipment or facilities). Upon request of Customer at the time of submission of the applicable Customer Order, Level 3 will interconnect such Level 3 Cross Connect Service directly to Customer provided equipment or facilities within the Level 3 Facility; provided, however, Level 3 shall not be liable to Customer or any third party for any loss or damage to such Customer provided equipment or facilities arising out of such direct interconnection, except for damages caused by Level 3's intentional misconduct or gross negligence.



(C)     If for any reason any underlying Service associated with a Level 3 Cross Connect Service is terminated (including by expiry of its applicable Service Term without any renewal), Customer shall, within fifteen (15) days of termination or expiry of the underlying Service, take all reasonable steps to effect an orderly disconnection of the Level 3 Cross Connect Service, including but not limited to withdrawing, terminating and/or revoking any applicable Circuit Facility Assignment ("CFA") obtained through a local access provider. If Customer fails to do so within the specified time limit, Customer hereby (i) authorizes Level 3 to disconnect the applicable third party local access circuit(s) from its Network and to instruct the local access provider on Customer's behalf to remove the CFA from Level 3's shared or dedicated facilities and (ii) agrees to reimburse Level 3 for any ongoing charges levied by the local access provider until the local access circuit and any CFA is removed.

17.     Power.

(A)     Power is charged on a breakered amp load basis, a metered usage basis, or a kilowatt basis and on the basis of the prices charged by the power utility. In the event the power utility increases the price paid by Level 3 for power provided to any Space, Level 3 may pass-through to Customer such price increase upon written notice to Customer.

(B)     The maximum supportable power density in each Data Center facility is identified in Exhibit A. Any additional power is subject to prior written approval by Level 3, in Level 3's sole discretion, and may be conditioned on additional terms and conditions. If Customer exceeds the applicable maximum supportable power density level for 1 consecutive hour or more and Customer does not reduce (and thereafter continually maintain) its power consumption at a level below the maximum supportable power density within 5 days of written notice by Level 3, then Level 3 may, at its option, increase the monthly recurring charges payable by Customer for the affected Space (to a rate determined by Level 3) or immediately terminate Customer's use of the Space. The above notwithstanding, if Customer's power consumption in excess of the applicable maximum supportable power density creates, in Level 3's reasonable opinion, an unsafe or hazardous environment (including threatening the safe, continued operation of any part of the Colocation Area) then Level 3 may immediately suspend providing power to Customer until Customer has cured the issue and provided Level 3 adequate assurances that such issues will not recur. Where possible and reasonable under the relevant circumstances, Level 3 will try to inform Customer prior to such suspension.

(C)     Subject to the prior written approval of Level 3, including approval of the subject equipment, design and manner of installation, Customer may provide a rack mounted UPS unit to provide conditioned AC power. Level 3 assumes no responsibility for the operation or performance of this equipment. Customer has sole liability therefor, and any Service Levels or SLAs are not applicable.

18.     Service Levels.

The following Service Levels describe scope and quality of the Services provided by Level 3 hereunder and the provisions on service credits for not meeting the Service Levels replace any statutory rights of Customer to reduce the charges for the Service.

(A)     Colocation Installation Service Level. Level 3 will exercise commercially reasonable efforts to install any Space on or before the Customer Commit Date specified for such Space. This Installation Service Level shall not apply to Customer Orders that contain incorrect information supplied by Customer, Customer Orders that are altered at Customer's request after submission and acceptance by Level 3, or Customer Orders that require Level 3 to configure Space to specifications other than Level 3's standard specifications for Space (such standard specifications shall be made available to Customer upon request). In the event Level 3 does not meet this Installation Service Level for a particular Space for reasons other than an Excused Outage, Customer will be entitled to a service credit equal to the charges for one (1) day of the MRC for the affected Space for each day of delay, up to a monthly maximum credit of four (4) days.

(B)     Cross Connect Installation Service Level. Level 3 will exercise commercially reasonable efforts to install any Level 3 Cross Connect Service on or before the Customer Commit Date specified if any for the particular Level 3 Cross Connect Service. This Installation Service Level shall not apply to Customer Orders that contain incorrect information supplied by Customer or Customer Orders that are altered at Customer's request after submission and acceptance by Level 3. In the event Level 3 does not meet this Installation Service Level for a particular Level 3 Cross Connect Service for reasons other than an Excused Outage, Customer will be entitled to a service credit off of the non-recurring charges ("NRC") and/or monthly recurring charges ("MRC") for the affected Level 3 Cross Connect Service as set forth in the following table:

For Level 3 Cross Connect Service:

| Installation Delay Beyond Customer Commit Date | Service Level Credit |
| --- | --- |
| 1 – 5 business days | Amount of NRC |
| 6 – 20 business days | Amount of NRC plus charges for one (1) day of the MRC for each day of delay |
| 21 + business days | Amount of NRC plus one (1) month's MRC |

(C)     Power Service Level. In the event of any outage of Level 3 provided conditioned power (power provided with UPS or DC battery backup systems) to the Space for reasons other than an Excused Outage, Customer will be entitled to a service



credit equal to a percent of the MRC for the affected Space based on the cumulative unavailability for the affected Space in a given calendar month as set forth in the following table):

| Cumulative Unavailability (in hrs:mins:secs) | Level 3 Provided Conditioned AC or DC Power Service Level Credit stated as a credit equal to a % of MRC |
|---|---|
| 00:00:01 – 00:05:00 | 2.5% |
| 00:05:01 – 00:45:00 | 5% |
| 00:45:01 – 04:00:00 | 10% |
| 04:00:01 – 08:00:00 | 20% |
| 08:00:01 –12:00:00 | 30% |
| 12:00:01 –16:00:00 | 40% |
| 16:00:01 – 24:00:00 | 50% |
| 24:00:01 or greater | 100% |

Any Level 3 provided unconditioned power (i.e. power provided without Level 3 operated UPS or DC battery backup systems and/or power solely conditioned by customer provided UPS systems known as "House Power") is not covered under this or any Service Level Agreement. This means that Level 3 shall owe to the Customer only the effort to maintain power supply as provided by and obtained from the relevant power utility.

19.    **Applicable Law and Local Country Agreements.** Notwithstanding anything to the contrary in the Agreement, the construction, interpretation and operation of these terms and conditions shall be governed (i) in the case of Facilities in the United States, by the laws of the State of New York and (ii) in the case of Facilities located outside the United States, by the laws of the country in which the applicable Facility is located. With respect to Service provided in certain jurisdictions outside the United States (if any), if requested by Level 3, Customer agrees that it (or its local affiliate) will enter into a separate local country addendum/agreement (as provided by local authorities) ("LCA") with the respective Level 3 affiliate that provides the local Service(s) and such Level 3 affiliate will invoice the Customer (or its local affiliate) party to the LCA for the respective local Service(s).

20. **Value Added Tax**. If, in any jurisdiction in which Level 3 provides Space to Customer, the usage right in paragraph 3 above is regarded as the letting or leasing of immovable property for value added tax ("VAT") purposes and the applicable VAT legislation allows the parties to elect to waive the exemption and charge VAT, then Level 3 and Customer agree to elect to waive the exemption and fulfill all necessary actions and arrangements to meet the requirements of the applicable law to validate such election. In addition, Exhibit B sets out specific VAT requirements for Germany and Italy and Exhibit B shall apply to all Customer Equipment placed in any such jurisdiction.



EXHIBIT A

ENVIRONMENT LEVELS

| Facility | Maximum and Minimum Humidity Levels | Maximum Temperature Levels* |
|---|---|---|
| Premier Elite | 30% to 70% | 78 °F (26 °C) |
| Premier Select/Premier | 20% to 80% | 85 °F (29.5°C) |

* Measured 6'6" (78 inches or 1.98 meters) above the finished floor, and 8" (0.203 meter) in front of Customer equipment on the Cold Aisle.

### MAXIMUM SUPPORTABLE POWER DENSITY

Maximum Power Density for Private Suites

| Facility | Maximum Watts per Square Meter [1] [EMEA / LatAm] | Maximum Watts per Rack inside a Suite [2] [EMEA / LatAm] | Maximum Watts per Square Foot [1] [NA] | Maximum Watts per Rack inside a Suite [2] [NA] |
|---|---|---|---|---|
| Premier Elite | 750 | 5,000 | 200 | 10,000 |
| Premier Select / Premier | 500 | 2,000 | 75 | 5,000 |

[1] Maximum Watts per Square Meter or Maximum Watts per Square Foot is measured as the total watts of power within a Private Suite that Customer can safely use (draw) at a static point in time, divided by the total number of Contracted Square Meters or Contracted Square Foot in the Private Suite.

[2] Maximum Watts per Rack is measured as the total watts of power to a specific Rack within a Private Suite that Customer can use (draw) at a static point in time in that specific Rack as long as the overall power use of the Private Suite does not exceed the stated maximum watts per square foot or maximum watts per square meter, as applicable.

Maximum Power Density for Stand Alone Cabinets

| Facility | Maximum Watts per Cabinet [NA / EMEA / LatAm] [1] |
|---|---|
| Premier Elite | 10,000 / 6,000 / 5,000 |
| Premier Select / Premier | 5,000 / 6,000 / 3,000 |

[1] Maximum Watts per Stand Alone Cabinet is measured as the total watts of power to a specific Cabinet that Customer can use (draw) at a static point in time in that specific Cabinet.



EXHIBIT B

## SPECIFIC JURISDICTION REQUIERMENTS FOR VAT

"VAT" means (i) in the **UK**, value added tax as provided for in the Value Added Tax Act 1994 (as amended or re-enacted in each case from time to time) and legislation supplemental thereto; ii) in other Member States of the European Union, the tax levied in any relevant Member State pursuant to Council Directive 2006/112/EC of 28 November 2006 on the common system of value added tax (as amended); and (iii) in any jurisdiction that is not a Member State, any Value Added Tax or equivalent tax; in any of these cases, at the rate in force when the relevant supply is made, and includes any tax of a similar nature substituted for, or levied in addition to such value added tax.

In accordance with the Agreement, the charges and fees are exclusive of applicable taxes, which are to be paid by Customer. This Exhibit contains guidance on taxes in Germany and Italy; this Exhibit applies only to Customer equipment placed in such jurisdictions.

**Germany**. For colocation services in Germany, reference is made to Sec. 4 Nr. 12 and Sec. 9 of the German VAT Code ("*Umsatzsteuergesetz*"). The Customer shall only use the premises of Level 3 for turnover which does not preclude Level 3's right to deduct value added tax and shall without undue delay inform Level 3 of any and all circumstances which might affect such right. The Customer shall provide to Level 3, upon request, all documents necessary to enable Level 3 to fulfill its information duties towards the tax authorities under Sec. 9 para. 2 of the German VAT Code.

**Italy:** Contratto soggetto ad IVA a seguito di espressa opzione del locatore ai sensi dell'art. 10, n. 8), del D.P.R. 26 ottobre 1972, n. 633 ("Agreement subject to VAT following explicit option by the lessor, pursuant to Article 10, No. 8), of Presidential Decree No. 633 of October 26, 1972")"

Level 3 _____   Customer _PD_____

# Exhibit B



Level(3)
COMMUNICATIONS
Connecting and Protecting
the Networked World℠

## U.S. ADDENDUM
(Reviewed: October 2014)

This U.S. Addendum, dated as of  March 6th, 2015 ("LCA"), by and between **Level 3 Latin American Solutions, LLC.** whose principal offices are located at 701 Waterford Way, Suite 390, Miami, FL (33126), USA, ("Level 3 U.S.") and Telegram Messenger LLP  whose principal offices are located at Suite 2, 23-24 Great James Street, London WC1N 3ES ("Customer"), is intended to be the sole agreement between Level 3 U.S. and Customer relating to the provision of Services provided by Level 3 U.S. and becomes part of the Master Services Agreement dated July 22nd, 2014 (the "Master Agreement"), between  the Customer and Level 3 Communications GmbH.

**1.**    **Relationship to other documents:** Level 3 U.S. and Customer hereby agree to incorporate the terms and conditions of the Master Agreement in this U.S. Addendum and agree that the Master Agreement shall apply to the provision of the Services provided by Level 3 U.S. to Customer, except as otherwise provided herein. In the event of a conflict, this U.S. Addendum shall prevail over the Master Agreement. Initial capitalized terms used herein and not otherwise defined, shall have the meanings ascribed thereto in the Master Agreement. Customer acknowledges and accepts that its Affiliates (including the Affiliate that signed the Master Agreement) may issue and sign Customer Orders under this LCA, which shall be valied and binding between Customer and Level 3  U.S. upon acceptance of the latter, in accordance with the provisions of said Customer Orders or the Master Agreement.

**2.**  **Payment of Invoices:** Prices are agreed in USD and shall be paid in such currency. Invoices are issued monthly and are payable within 30 days of the date of the invoice. Fixed charges are billed in advance and usage-based charges are billed in arrears. Billing for partial months is prorated. Customer is responsible for all charges respecting the Service, even if incurred as the result of unauthorized use. If Customer is required to make any deduction or withholding from any payment due to Level 3 in connection with applicable bank transfers charges, then, notwithstanding anything to the contrary contained in the Master Agreement, the gross amount payable by Customer to Level 3 will be increased so that, after any such bank transfer deduction or withholding, the net amount received by Level 3 will not be less than what Level 3 would have received had no such deduction or withholding been required.

If Customer reasonably disputes an invoice, Customer must pay the undisputed amount and submit written notice of the disputed amount (with details of the nature of the dispute and the Services and invoice(s) disputed).  Disputes must be submitted in writing within 30 days from the date of the invoice. If the dispute is resolved against Customer, Customer shall pay such amounts plus interest from the date originally due.

Failure to comply with any payment obligation shall constitute an automatic event of default and such circumstance entitles Level 3 to suspend the Services after giving notice. The amounts due shall accrue a monthly interest of 1,5%, unless applicable laws allow a higher interest rate.

If Customer requests to include an internal Purchase Order number in the invoices or to attach said internal Purchase Order ("Purchase Order") or any other requirement different to the ones agreed to in the Master Agreement  or otherwise or requested by applicable laws ("Requirements") in order to file the invoice, Customer shall inform said Requirements at least 15 (fifteen) days prior to commencement of the month in which Services will be rendered. Failure to issue or inform Level 3 about the Purchase Order or any other Requirement shall not prevent Level 3 from issuing the invoices or Customer from receiving or accepting them and/or its potential default, and shall entitle Level 3 to apply interest as agreed in the Master Agreement or otherwise, suspend Services after giving notice to Customer and/or terminate the Services in accordance with the terms of theMaster Agreement and/or applicable regulations.

**3.**    **Notices:** All notifications, requests, demands and other communications related to this U.S. Addendum  shall be addressed in writing to the relevant party at the address specified in the preamble to this U.S. Addendum.

**4.**    **Governing Law & Dispute Resolution:** The validity, interpretation and performance of this U.S. Addendum shall be governed by the laws agreed under the Master Agreement, while disputes related exclusively to the Services provided by Level 3 U.S. which are regulated by mandatory laws of a relevant country that cannot be opted out, shall be interpreted



Connecting and Protecting
the Networked World℠

and resolved under such applicable laws. Any disputes related to this U.S. Addendum, shall be submitted to the tribunal agreed under the Master Agreement.

**5.     Entire Agreement:** This U.S. Addendum, together with the terms of the Master Agreement is the entire agreement between Level 3 U.S. and Customer concerning the provision of Services by Level 3 U.S. to Customer, and it supercedes all prior proposals, representations, statements or understandings, whether written or oral, concerning the provision of Services by Level 3 U.S. to Customer. Level 3 U.S. is only responsible with respect to Services provided by Level 3 U.S. No change, modification or waiver of the terms of this U.S. Addendum shall be binding unless included in a written statement signed by both parties. Any terms or conditions purportedly imposed by purchase orders or other documents used by Customer shall be void and of no effect.

This U.S. Addendum may be executed in counterparts, each of which when executed and delivered shall be deemed an original.  All of such counterparts shall constitute one and the same instrument.

| CUSTOMER | LEVEL 3 U.S. |
|---|---|
| Telegram Messenger LLP | |
| Name Vladimir Vedeneev | Name _____ |
| Title CEO | Title _____ |
| Date 23.03.2015 | Date _____ |
| | |
| Name _____ | Name _____ |
| Title _____ | Title _____ |
| Date _____ | Date _____ |

© 2011 Level 3 Communications, LLC. All rights reserved. Proprietary and Confidential

Exhibit C

**Letter of Agreement**

This Letter of Agreement ("LoA") is signed by and between:

Level 3 Communications GmbH (Rüsselsheimer Strasse 22, 60326 Frankfurt am Main, Germany (registered at Amtsgericht Frankfurt am Main under HRB 43850, USt-IdNr. DE 195 395 583) ("Level 3"),

Telegram Messenger LLP (Suite 2, 23-24 Great James Street, London WC1N 3ES (registered in England and Wales under number OC391410), and

Telegram Corp. (Global Bank Tower, 18th Floor, 50th Avenue, P.O. Box 552484, Paitilla, Panama City, Panama, RUC 2036711-1-745739),

hereinafter referred to jointly as "Parties" and separately as a "Party".

Whereas:

   i.   Telegram Messenger LLP and Telegram Corp. are affiliated entities and a part of the group of companies developing and running Telegram, a messaging app (Telegram Messenger LLP, Telegram Corp. and their affiliated entities are jointly referred to as "Telegram"; for the purposes of this LoA affiliated entities shall be defined as entities that directly or indirectly control, are controlled by, or are under common control with, another person or entity);

   ii.   In July 2014 discussions took place between Level 3 and representatives of Telegram with an intention to conclude a Master Service Agreement between Level 3 and one of Telegram entities with such Master Service Agreement governing the purchase of services by Telegram from Level 3;

   iii.   On 22 July 2014 a draft Master Service Agreement was sent to a representative of Telegram and on the same date the Master Service Agreement was returned by a representative of Telegram signed;

   iv.   A number of orders for services were placed by Telegram with Level 3 and Level 3 affiliated entities in the period after 22 July 2014 ("Telegram Orders"). Though Telegram Messenger LLP was the entity invoiced by Level 3 and Level 3 affiliated entities for the services provided under the said orders, all invoices were paid by Telegram Corp.

   v.   On June 8th, 2017 Level 3 was notified by Mr. Durov, the sole managing partner of Telegram Messenger LLP, that the signature on the Master Service Agreement did not belong to him, and, therefore, the said Master Service Agreement was null and void.

In exchange of mutual covenants and considerations, the Parties agreed as follows:

1. Master Service Agreement received by Level 3 on 22 July 2014 is null and void, as stated by Mr. Durov in his email to Level 3 of June 8th, 2017.

2. Telegram confirms that Telegram Corp. is the entity which received and consumed services from Level 3 and Level 3 affiliated entities, as, unlike Telegram Messenger LLP, it is the entity that has human, technical and economic resources to receive and consume such services.

3. Level 3 and Telegram Corp. agree to enter in a Master Service Agreement to govern all existing Telegram Orders and any future orders to be placed by Telegram with Level 3.

4. For avoidance of doubt, Master Service Agreement between Level 3 and Telegram Corp. signed as per Paragraph 3 above shall apply to Telegram Orders with retrospective effect as of the respective customer order's effective date.

5. Level 3 shall issue credit notes to Telegram Messenger LLP for invoices issued by Level 3 and its affiliated entities in Europe to cover all invoices issued by Level 3 and Level 3 affiliated entities to Telegram Messenger LLP for services provided under Telegram Orders.

6. Level 3 and Level 3 affiliated entities shall issue invoices to Telegram Corp., covering all services provided by Level 3 and Level 3 affiliated entities in Europe under Telegram Orders. Level 3 and Level 3 affiliated entities shall issue all future invoices to Telegram Corp. for the services provided under Telegram Orders and any new customer orders placed by Telegram under the Master Service Agreement between Level 3 and Telegram Corp.

7. Telegram Corp. shall indemnify, defend and hold Level 3, Level 3 affiliated entities, their officers and employees harmless of any claims that may arise out of or in connection with the Master Service Agreement between Level 3 and Telegram Messenger LLP, including claims in connection with its invalidity or brought by any third party as a consequence of its invalidity, this LoA and Telegram Orders, including, but not limited to, any claims by any public authorities in any jurisdiction. Furthermore, Telegram Corp. confirms that any representations contained in this LoA or in any correspondence between the Parties preceding the signature of the LoA, are true and correct. If any of the representations appear to be false, whether due to intent on the side of Telegram and Telegram employees and representatives, or not, Telegram Corp. shall reimburse in full any and all expenses and

damages borne by Level 3 as a result, including, but not limited to, any fines and legal fees and expenses.

8.  This LoA shall take effect on the last signature date ("Effective Date").

9.  Telegram Messenger LLP waives any claims in connection with the provision of services by Level 3 and Level 3 affiliated entities, including but not limited to service credit claims, as of the Effective Date of this LoA.

10. The failure to exercise, or delay in exercising, a right, power or remedy provided by this LoA or by law shall not constitute a waiver of that right, power or remedy. If a Party waives a breach of any provision of this LoA this shall not operate as a waiver of a subsequent breach of that provision, or as a waiver of a breach of any other provision.

11. The existence of this LoA and its terms, and all information and documentation that is not generally known to the public, that is disclosed or made available directly or indirectly to the other Party and that is or should be reasonably understood to be proprietary and confidential to the disclosing Party, shall be held in complete confidentiality by each of the Parties and shall not be disclosed to any other person except:

a)  to the auditors, the legal and other professional advisers of any Party, for the purposes of taking professional advice on matters where this LoA may be relevant (and in such cases, the Party seeking such advice will procure that the professional advisers agree to keep the existence and terms of this LoA confidential); or

b)  where any Party is under a legal or regulatory obligation to make such disclosure, but limited to the extent of that legal or regulatory obligation; or

c)  to the extent that it is already in the public domain (other than as a result of a breach of this LoA); or

d)  with the prior written consent of the other Parties to this LoA; or

e)  to a Party's employees and agents who have a need to know for reasonable business purposes (including without limitation for the purposes of resolving or analysing this LoA or for accounting or reporting purposes); or

f)  to any regulatory authority or any relevant court or tribunal or alternative dispute resolution forum of competent jurisdiction for the purpose of proving the terms of this LoA in the event of an alleged breach by any of the Parties to it; or

g)  insofar as any regulatory authority or any court or tribunal of competent jurisdiction may order.

12. Each Party warrants and represents to the others that it has full power and authority without requiring the consent of any person and has taken the necessary corporate or other actions to enter into this LoA and fully exercise rights and discharge its obligations under this LoA.

13. Neither Party shall have a right to assign the rights under this LoA.

14. This LoA shall be governed by and shall be construed in accordance with English law. The English courts shall have exclusive jurisdiction to settle any claim, dispute or matter of difference which may arise out of, or in connection with this LoA.

15. This LoA is made in three (3) identical copies, one for each Party.

In witness thereof, the Parties have executed this Settlement Agreement.

**For Level 3 Communications GmbH**

Name: *Nicholas Spence*

Position: *EMEA General Counsel*

Date: *22 June 2017*

**Level(3)**
COMMUNICATIONS
Level 3 Communications GmbH
Rüsselheimer Straße 22
60326 Frankfurt am Main
Germany

**For Telegram Messenger LLP**

Name: PAVEL DUROV

Position: MANAGING PARTNER

Date: JUNE 21 2017

**For Telegram Corp.**

Name: PAVEL DUROV

Position:

Date: JUNE 21 2017

<u>ANNEX A</u>

<u>MASTER SERVICES AGREEMENT TEMPLATE</u>

## MASTER SERVICE AGREEMENT

This Master Service Agreement ("Agreement") is made this ___21___ day of ___JUNE___ 2017 between

**Telegram Corp.**, Global Bank Tower, 18th Floor, 50th Avenue, P.O. Box 552484, Paitilla, Panama City, Panama, RUC 2036711-1-745739 ("Customer")

and

**Level 3 Communications GmbH**, Rüsselsheimer Strasse 22, 60326 Frankfurt am Main, Germany (registered at Amtsgericht Frankfurt am Main under HRB 43850, USt-IdNr. DE 195 395 583) („Level 3").

This Agreement provides the general terms and conditions applicable to Customer's purchase of all communications and other services ("Service") from Level 3 based on individually agreed Customer Orders (as defined below). The scope of the Services is defined in Service Schedules applicable to the respective Service. The applicability of any deviating terms is excluded, even in the case that Level 3 provides the Services and does not expressly contradict such terms.

<u>ARTICLE 1. ORDERS FOR AND DELIVERY OF SERVICE; CONTRACT TERM</u>

1.1     <u>Submission and Acceptance of Customer Order(s); Contract Term</u>. Customer may submit individual requests for Service in a form designated by Level 3 ("Customer Order"). Customer Orders shall contain the duration for which Service is ordered ("Service Term"), a description of the Service, and the applicable non-recurring charges ("NRC") and monthly recurring charges ("MRC") for the Service. The Service Term starts with the date of the billing commencement according to Article 2.1 below. Service will continue on a month to month basis at the expiration of the Service Term at Level 3's then current rates, until terminated by either party upon 30 days' prior written or electronic notice to the other party to the end of the Service Term or to the end of a prolongation month. Level 3 will notify Customer of acceptance of the Customer Order by delivering (in writing or electronically) the date by which Level 3 will install Service (the "Customer Commit Date") or by delivering the Service. Renewal Customer Orders will be accepted by Level 3's continuation of Service. If Customer submits Customer Orders electronically, Customer shall assure that any passwords or access devices are available only to those having authority to submit Customer Orders. Customer will pay Level 3's then current charges for moves, adds or changes agreed to by Level 3 in respect of any Customer Order or Service.

1.2     <u>Credit Approval and Deposits</u>. Customer will provide Level 3 with credit information as requested and delivery of Service is subject to credit approval by Level 3. Level 3 may require Customer to make a deposit as a condition of Level 3's acceptance of any Customer Order or continuation of: a) usage-based Services; or b) non-usage based Services where Customer fails to timely pay Level 3 hereunder or Level 3 reasonably determines that Customer has had an adverse change in financial condition. Deposits will not exceed 2 months' estimated charges for Service and are due upon Level 3's written request. When Service is discontinued, the deposit will be credited to Customer's account and the balance refunded.

1.3     <u>Customer Premises; Level 3 Equipment</u>. If access to non-Level 3 facilities is required for the installation, maintenance, grooming, movement, upgrade and/or removal of Level 3 equipment, Customer shall, at its expense, secure such right of access and shall arrange for the provision and maintenance of power and heating, ventilation and air condition ("HVAC") as needed for the proper operation of such equipment. Title to equipment (including software) provided by Level 3 remains with Level 3. Customer will not, and will not permit others to (a) disconnect, repair or tamper in any way with Level 3's equipment and (b) create or permit to be created any encumbrances on Level 3's equipment.

1.4     <u>Scheduled Maintenance and Local Access</u>. Scheduled maintenance will not normally result in Service interruption. If scheduled maintenance requires Service interruption, Level 3 will: (i) provide Customer 7 days' prior written notice, (ii) work with Customer to minimize such interruptions and (iii) use commercially reasonable efforts to perform such maintenance between midnight and 6:00 a.m. local time in the country where the Service is provided to Customer.
If third party local access services obtained by Customer are involved in or connected to the Services, Customer will: (i) provide Level 3 with circuit facility and firm order commitment information and design layout records to enable cross-connects to Level 3 Service(s) (provided by Level 3 subject to applicable charges), (ii) cooperate with Level 3 (including but not limited to changing/determining demarcation points and/or equipment and providing necessary letters of authorisations) in respect of circuit grooming or re-provisioning, and (iii) where a related Service is disconnected, provide Level 3 a written disconnection firm order commitment from the relevant

third party provider.

Level 3 may re-provision any local access circuits obtained by Level 3 from one off-net provider to another or to the Level 3 owned and operated network (on-net), and such changes shall be treated as scheduled maintenance, provided that Level 3 shall provide Customer 30 days' notice of such activity.

## ARTICLE 2. BILLING AND PAYMENT

**2.1**   **Commencement of Billing.** Level 3 will deliver a written or electronic notice to Customer when Service is installed, has been tested and is functioning properly (a "Connection Notice") at which time billing will commence ("Service Commencement Date"). If Customer notifies Level 3 within 3 business days after delivery of the Connection Notice that Service is not functioning properly, Level 3 will correct any deficiencies and, upon Customer's request, credit Customer's account in the amount of 1/30 of the applicable monthly recurring charges (MRC) for each day the Service did not function properly. If Level 3 cannot complete installation due to Customer delay or inaction, Level 3 may begin charging Customer for the Service and Customer shall pay such charges which will appear on Customer's first invoice following the Service Commencement Date.

**2.2**   **Payment of Invoices and Disputes.** Invoices are delivered monthly and due immediately, i.e. to be paid within 30 days after the invoice date. Fixed charges are billed in advance and usage-based charges are billed in arrears. Billing for partial months is prorated. Past due amounts bear interest at 1.5% per month or the highest rate allowed by law (whichever is less). Customer is responsible for all charges in respect of the Service attributable to him, even if incurred as the result of unauthorized use. If Customer reasonably disputes an invoice, Customer must pay the undisputed amount and submit written notice of the disputed amount (with details of the nature of the dispute and the Services and invoice(s) disputed). Disputes must be submitted in writing within 90 days from the date of the invoice. If the dispute is resolved against Customer, Customer shall pay such amounts plus interest from the date originally due.

**2.3**   **Taxes and Fees.** Excluding taxes based on Level 3's net income, Customer is responsible for all taxes and fees arising in any jurisdiction imposed on or incident to the provision, sale or use of Service, including but not limited to value added, consumption, sales, use, gross receipts, withholding, excise, access, bypass, ad valorem, franchise or other taxes, fees, duties or surcharges (including regulatory surcharges), whether imposed on Level 3 or a Level 3 affiliate, along with similar charges stated in a Customer Order (collectively "Taxes and Fees"). Charges for Service are exclusive of Taxes and Fees. Some Taxes and Fees and the costs of administering the same, are recovered through imposition of a percentage surcharge(s) on the charges for Service. If Customer is required by law to make any deduction or withholding of withholding Taxes from any payment due hereunder to Level 3, then, notwithstanding anything to the contrary contained in this Agreement, the gross amount payable by Customer shall be increased so that, after any such deduction or withholding for such withholding Taxes, the net amount received by Level 3 will not be less than Level 3 would have received had no such deduction or withholding been required. Customer may present Level 3 with an exemption certificate eliminating Level 3's liability to pay certain Taxes and Fees; Level 3 will give effect thereto prospectively.

**2.4**   **Regulatory and Legal Changes.** If changes in applicable law, regulation, rule or order materially affect delivery of Service, the parties will negotiate appropriate changes to this Agreement. If the parties cannot reach agreement within 30 days after Level 3's notice requesting renegotiation: (a) Level 3 may, on a prospective basis after such 30 days period, pass any increased delivery costs on to Customer and (b) if Level 3 does so, Customer may terminate the affected Service on notice to Level 3 delivered within 30 days.

**2.5**   **Cancellation and Termination Charges.**

**(A)**   If Customer declares that he wishes to cancel a Customer Order (or portion thereof) **prior to** the delivery of a Connection Notice for reasons not attributable to Level 3, Level 3 may agree to a cancellation of the affected Customer Order and Service, subject to the Customer agreeing to pay Level 3 a cancellation charge equal to the sum of: (i) for "off-net" Service, any third party termination charges for the cancelled Service; (ii) for "on-net" Service, 1 month's monthly recurring charges for the cancelled Service; (iii) the non-recurring charges for the cancelled Service; and (iv) Level 3's out of pocket costs (if any) incurred in constructing facilities necessary for Service delivery.

**(B)**   If Customer declares that he wishes to terminate any Service(s) **after** the delivery of a Connection Notice but prior to the end of the Service Term for reasons not attributable to Level 3, Level 3 may agree to a premature termination effective upon expiry of 30 days from receipt of the Customer declaration, subject to the Customer agreeing to pay a cancellation charge equal to the sum of: (i) all unpaid amounts for Service actually provided ; (ii) 100% of the remaining monthly recurring charges for months 1-12 of the Service Term; (iii) 50% of the remaining monthly recurring charges for month 13 through the end of the Service Term and (iv) if not recovered by the foregoing, any termination liability payable to third parties resulting from the termination, and any out of pocket costs of construction to the extent such construction was undertaken to provide Service hereunder.

liability regardless of negligence or intent ("*verschuldensunabhängige Garantiehaftung*"), Level 3's liability is excluded.

4.2     Unlimited Liability. Nothing in this Agreement shall be construed as limiting the liability of either party for, (a) personal injury or death resulting from the negligence or intent of a party or its employees, (b) for fraud or fraudulent misrepresentation by a party or its employees, (c) breach of Article 5.8 (Confidentiality), and (d) any liability of either party which cannot be limited or excluded by law.

4.3     Service Levels.

(A)     The "Service Level" commitments applicable to Services are contained in the Service Schedules for each Service. If Level 3 does not meet a Service Level and is accountable for such failure (see also Article 4.7 below), a credit will be issued to Customer as stated in the applicable Service Schedule on Customer's request. Level 3's maintenance log and trouble ticketing systems are used to calculate Service Level events. To request a credit, Customer must contact Level 3 Customer Service (contact information is located at www.level3.com) or deliver a written request (with sufficient detail to identify the affected Service) within 60 days after the end of the month in which the event occurred. Total monthly credits will never exceed the charges for the affected Service for that month.

(B)     Save where the Customer has the right to terminate this Agreement in accordance with Article 3.1, Customer's sole remedies for any non-performance, outages, failures to deliver or defects in Service are contained in (i) the Service Levels and chronic outage provisions (if any) applicable to the affected Service, and (ii) Article 4.5 below. Level 3's liability pursuant to Article 4.1 and 4.2 remains unaffected.

4.4     Liability Limitation. Subject to Article 4.1 (C) and (G), 4.2 and 4.3, Level 3's total aggregate liability in respect of any claim, whether arising from contractual or non-contractual liability or otherwise under or in connection with this Agreement shall in no event exceed 100% of all charges paid during the 12 month period immediately prior to which the relevant claim arises.

4.5     Right of Termination for Installation Delay. Instead of installation Service Level credits, if Level 3's installation of Service is delayed by more than 30 business days beyond the Customer Commit Date, Customer may terminate the affected Service without liability upon written notice to Level 3, provided such written notice is delivered prior to Level 3 delivering a Connection Notice for the affected Service. This Section shall not apply where Level 3 is constructing facilities to a new location not previously served by Level 3.

4.6     Disclaimer of Warranties. Level 3 makes no warranties or representations, express or implied, either in fact or by operation of law, statutory or otherwise, including warranties of merchantability or fitness for a particular use, except those expressly set forth in this Agreement or any applicable Service Schedule.

4.7     Accountability ("*Vertretenmüssen*"). Level 3 cannot be made accountable for the following impairments of performance: (i) Any default, non-availability, delay or other quality degradation of the Service caused by events of force majeure according to Article 5.1; (ii) impairments of performance for which the customer is accountable for or caused by equipment or power supply services provided by the customer; (iii) impairments of performance attributed to scheduled maintenance according to Article 1.4; and (iv) any default, non-availability, delay or other quality degradation of the Service caused by third parties (except suppliers of Level 3 – but especially other carriers or network interconnection points controlled by third parties, equipment or power supply services provided by third parties, or cable cuts caused by third parties). All these events under (i) to (iv) are considered "Excused Outages".

## ARTICLE 5. GENERAL TERMS

5.1     Force Majeure. Neither party shall be liable, nor shall any credit allowance or other remedy be extended, for any failure of performance or equipment due to causes beyond such party's reasonable control ("force majeure event"). In the event Level 3 is unable to deliver Service as a result of a force majeure event, Customer shall not be obligated to pay Level 3 for the affected Service for the duration of the event.

5.2     Assignment and Resale. Customer may not assign its rights or obligations under this Agreement or any Customer Order without the prior written consent of Level 3, which will not be unreasonably withheld. Level 3 may, after having given prior written notice to the Customer, assign and transfer any or all of its rights and obligations under this Agreement to an affiliate of Level 3. This Agreement shall apply to any permitted transferees or assignees. Unless otherwise provided in a Service Schedule but always subject to applicable sanctions and export control regulations, Customer may provide Service to third parties or use the Services in connection with goods or services by Customer to third parties ("Customer Provided Services") provided that Customer shall indemnify, defend and hold Level 3 and its affiliates harmless from any claims arising from or related to any Customer Provided Services. If Customer sells telecommunications services, Customer warrants that it has and will at all times have the requisite authority with appropriate regulatory agencies in respect of the same. Nothing in this Agreement, express or implied, confers upon any third party any right, benefit or remedy

liability regardless of negligence or intent ("*verschuldensunabhängige Garantiehaftung*"), Level 3's liability is excluded.

**4.2**     Unlimited Liability. Nothing in this Agreement shall be construed as limiting the liability of either party for, (a) personal injury or death resulting from the negligence or intent of a party or its employees, (b) for fraud or fraudulent misrepresentation by a party or its employees, (c) breach of Article 5.8 (Confidentiality), and (d) any liability of either party which cannot be limited or excluded by law.

**4.3**     Service Levels.

(A)     The "Service Level" commitments applicable to Services are contained in the Service Schedules for each Service. If Level 3 does not meet a Service Level and is accountable for such failure (see also Article 4.7 below), a credit will be issued to Customer as stated in the applicable Service Schedule on Customer's request. Level 3's maintenance log and trouble ticketing systems are used to calculate Service Level events. To request a credit, Customer must contact Level 3 Customer Service (contact information is located at www.level3.com) or deliver a written request (with sufficient detail to identify the affected Service) within 60 days after the end of the month in which the event occurred. Total monthly credits will never exceed the charges for the affected Service for that month.

(B)     Save where the Customer has the right to terminate this Agreement in accordance with Article 3.1, Customer's sole remedies for any non-performance, outages, failures to deliver or defects in Service are contained in (i) the Service Levels and chronic outage provisions (if any) applicable to the affected Service, and (ii) Article 4.5 below. Level 3's liability pursuant to Article 4.1 and 4.2 remains unaffected.

**4.4**     Liability Limitation. Subject to Article 4.1 (C) and (G), 4.2 and 4.3, Level 3's total aggregate liability in respect of any claim, whether arising from contractual or non-contractual liability or otherwise under or in connection with this Agreement shall in no event exceed 100% of all charges paid during the 12 month period immediately prior to which the relevant claim arises.

**4.5**     Right of Termination for Installation Delay. Instead of installation Service Level credits, if Level 3's installation of Service is delayed by more than 30 business days beyond the Customer Commit Date, Customer may terminate the affected Service without liability upon written notice to Level 3, provided such written notice is delivered prior to Level 3 delivering a Connection Notice for the affected Service. This Section shall not apply where Level 3 is constructing facilities to a new location not previously served by Level 3.

**4.6**     Disclaimer of Warranties. Level 3 makes no warranties or representations, express or implied, either in fact or by operation of law, statutory or otherwise, including warranties of merchantability or fitness for a particular use, except those expressly set forth in this Agreement or any applicable Service Schedule.

**4.7**     Accountability (*„Vertretenmüssen"*). Level 3 cannot be made accountable for the following impairments of performance: (i) Any default, non-availability, delay or other quality degradation of the Service caused by events of force majeure according to Article 5.1; (ii) impairments of performance for which the customer is accountable for or caused by equipment or power supply services provided by the customer; (iii) impairments of performance attributed to scheduled maintenance according to Article 1.4; and (iv) any default, non-availability, delay or other quality degradation of the Service caused by third parties (except suppliers of Level 3 – but especially other carriers or network interconnection points controlled by third parties, equipment or power supply services provided by third parties, or cable cuts caused by third parties). All these events under (i) to (iv) are considered "Excused Outages".

## ARTICLE 5. GENERAL TERMS

**5.1**     Force Majeure. Neither party shall be liable, nor shall any credit allowance or other remedy be extended, for any failure of performance or equipment due to causes beyond such party's reasonable control ("force majeure event"). In the event Level 3 is unable to deliver Service as a result of a force majeure event, Customer shall not be obligated to pay Level 3 for the affected Service for the duration of the event.

**5.2**     Assignment and Resale. Customer may not assign its rights or obligations under this Agreement or any Customer Order without the prior written consent of Level 3, which will not be unreasonably withheld. Level 3 may, after having given prior written notice to the Customer, assign and transfer any or all of its rights and obligations under this Agreement to an affiliate of Level 3. This Agreement shall apply to any permitted transferees or assignees. Unless otherwise provided in a Service Schedule but always subject to applicable sanctions and export control regulations, Customer may provide Service to third parties or use the Services in connection with goods or services by Customer to third parties ("Customer Provided Services") provided that Customer shall indemnify, defend and hold Level 3 and its affiliates harmless from any claims arising from or related to any Customer Provided Services. If Customer sells telecommunications services, Customer warrants that it has and will at all times have the requisite authority with appropriate regulatory agencies in respect of the same. Nothing in this Agreement, express or implied, confers upon any third party any right, benefit or remedy

under or by reason of this Agreement.

5.3     Affiliates. Service may be provided to Customer by an affiliate of Level 3, and Level 3 may use third parties to provide certain aspects of the Service, but Level 3 shall remain responsible to Customer for the delivery and performance of the Service.

Customer's affiliates may purchase Service pursuant to this Agreement and Customer shall be jointly and severally liable for all claims and liabilities related to Service ordered by any Customer affiliate.

5.4     Notices. Notices shall be in writing and will be delivered personally, or sent by first class post, or by facsimile, pre-paid overnight courier, or electronic mail (if an e-mail address is provided), addressed as follows:

If to Level 3:

Level 3 Communications GmbH
Rüsselsheimer Strasse 22, 60326 Frankfurt am Main
Germany
Attn: Corporate Counsel
Fax: +49 (69) 5060-8207

If to Customer:

Telegram Corp
Kaijanlahdentie 10, Savitaipale
54800 Finland

For billing inquiries/disputes and requests for Service Level credits: by filing a Credit Request via the MyLevel3 customer portal or via email to Billing@Level3.com.

Alternatively:
Level 3 Communications Limited
7th Floor, 10 Fleet Place
London, EC4M 7RB, United Kingdom
Attn: Dir, Customer Care & Billing

For requests for disconnection of Service (for other than default):

By submitting the disconnect request using the MyLevel3 customer portal or submitting it to Disconnects@Level3.com.

If no Customer address is provided above, notices may be provided to any electronic or physical address identified on the Customer Order. Either party may change its notice address upon notice to the other party. All notices shall be deemed given on (i) the date delivered if delivered personally, by facsimile or e-mail (or the next business day if delivered on a weekend or legal holiday), (ii) the business day after dispatch if sent by overnight courier, or (iii) the third business day after dispatch if sent by Post.

5.5     Acceptable Use / Privacy Policy. Customer's use of Service shall comply with Level 3's Acceptable Use Policy and Privacy Policy, as communicated in writing to Customer and which are also available through Level 3's web site (www. http://www.level3.com/en/network-security/acceptable-use-policy/ and http://www.level3.com/en/privacy/ respectively). Level 3 will communicate changes in the Acceptable Usage Policy and Private Policy to Customer in writing from time to time. Such changes will become binding, unless Customer objects to such changes within a period of one week after receipt of Level 3's information regarding the changes.

5.6     Data Protection. In this Agreement, the words 'data processor', 'data controller', 'personal data' and 'traffic data' shall have the meanings set out in the applicable data privacy laws and regulations.

(A)     During the performance of this Agreement, it may be necessary for Level 3 to collect ("Erheben"), process ("Verarbeiten") and use ("Nutzen") billing, utilization, traffic and other data necessary for the operation of its network and for the performance of its obligations under this Agreement. In the event Level 3 has access to and otherwise processes personal data, Customer agrees that Level 3 (or its affiliates) may use ("Verwenden") such data and other Customer data, in accordance with applicable law and regulation, for the performance of Level 3's obligations and the exercise of Level 3's rights under this Agreement.

(B)     Where the Services include Level 3 Managed Security Services, Level 3 will, notwithstanding Article 5.6 (D) below, also collect and process traffic data to provide the Services and improve the performance of those Services over time. Customer may withdraw consent to the processing of traffic data under this Article 5.6 (B) at any time by serving notice of termination to those Services in accordance with Article 2.5.

(C)     The parties hereby agree that, in order for Level 3 to perform its obligations under this Agreement, it may be necessary for Level 3 to transfer, process and store data outside the European Economic Area ("EEA")

including to the United States; Level 3's rights and obligations pursuant to Article 5.6 (A) above remain unaffected. Customer hereby agrees that nothing in this Agreement will prevent Level 3 carrying out any data processing operations (including but not limited to the retention and disclosure of data) in order for Level 3 to comply with applicable law or regulatory obligations. Where Level 3 provides Service as Customer's data processor, Customer authorizes Level 3 to enter into Standard Contractual Clauses (in the form adopted by decision 2010/87/EU of 5 February 2012 and with Appendices in the form set out in the Data Protection Schedule to this Agreement) with its Level 3 affiliate(s) on Customer's behalf and in Customer's name in order to provide adequate protection for such personal data.

(D)      Level 3 may provide Customer with Services (for example, call recording features related to Collaboration Services or Managed Security Services) as Customer's data processor. Where this is the case, Level 3 will (i) process personal data only in accordance with Customer's lawful instructions, including as set out in this Agreement, (ii) implement appropriate technical and organisational measures to protect personal data against accidental or unlawful destruction or accidental loss, alteration or unauthorised disclosure or access, (iii) notify Customer promptly if it becomes aware of any actual or attempted breach of this Article 5.6 (D) and, thereafter, take such steps as Customer may reasonably require, within the timescales reasonably required by Customer to remediate such breach of this Article 5.6 (D), and provide such additional information relating to such breach as Customer may reasonably require; and (iv) refer to Customer any requests, notices or other communication from data subjects, data protection authorities or any other law enforcement authority, for the Customer to resolve, to the extent permitted by applicable law. Where required, Level 3 and Customer shall conclude a separate data processing agreement in accordance with applicable law.

5.7      **Intellectual Property and Publicity**. Neither party is granted a license or other right (express, implied or otherwise) to use any trademarks, copyrights, service marks, trade names, patents, trade secrets or other form of intellectual property of the other party or its affiliates without the express prior written authorization of the other party. Neither party shall issue any press release or other public statement relating to this Agreement, except as may be required by law or agreed between the parties in writing.

5.8      **Confidentiality**. Either party may disclose (Disclosing Party) to the other party (Receiving Party) Confidential Information of the Disclosing Party. 'Confidential Information' means without limitation, any information which is identified as confidential at the time of disclosure, the content of this Agreement and any information which ought reasonably to be regarded as confidential. Confidential information does not include information that: (a) is in the possession of the Receiving Party without any obligation of confidentiality prior to disclosure by the Disclosing Party; (b) is published or becomes available to others, without restriction and without breach of this Agreement by the Receiving Party; (c) becomes available to the Receiving Party from others who are not in breach of any obligation of confidence; and (d) is developed by the Receiving Party independent of and without use of the Confidential Information. The Receiving Party shall; (i) use Confidential Information only to perform its obligations under this Agreement; (ii) not disclose the Confidential Information without the prior written consent of the Disclosing Party, other than to its employees, Affiliates, consultants, subcontractors and advisors who have a need to know and are bound by similar confidentiality obligations; and (iii) protect Confidential Information in the same manner as it protects its own confidential information. The obligations under this Section 5.8 shall continue for a period of two (2) years after termination or expiry of the Agreement.

5.9      **Governing Law; Amendment**. This Agreement, the Service Schedule(s), all Customer Order(s) executed hereunder and any dispute or claim arising out of it or in connection with them or their subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the laws of the Federal Republic of Germany, without regard to its choice of law rules. Legal venue is Frankfurt am Main. Level 3 remains entitled to bring action against the Customer at any competent court. This Agreement, including any Service Schedule(s) and Customer Order(s) executed hereunder, constitutes the entire and final agreement and understanding between the parties with respect to the Service and supersedes all prior written or oral agreement(s) relating to the Service. This Agreement may only be modified or supplemented by an instrument executed by an authorized representative of each party. No failure by either party to enforce any right(s) hereunder shall constitute a waiver of such right(s).

5.10     **Order of Precedence**. In the event of any conflict between this Agreement and the Terms of any Service Schedule and/or Customer Order, the order of precedence is as follows: (1) the Service Schedule, (2) this Agreement, and (3) the Customer Order.

5.11     **Latin American Services**. With respect to Latin American Services, Customer agrees that it (or its local affiliate) will enter into a separate local country addendum/agreement (as approved by local authorities) ("LCA") with the respective Level 3 affiliate which provides the local Service(s), and such Level 3 affiliate will invoice the Customer (or its local affiliate) party to the LCA for the respective local Service(s). For the purposes of this Agreement "Latin American Services" means any transport or telecommunications service where either or both of the originating or terminating end points of the traffic is located in any of Brazil, Argentina, Venezuela, Peru, Chile, Mexico, Panama and/or any other country (and their respective territorial waters) in Latin America in which Level 3 is licensed to provide services.

5.12    Subcontracting. Level 3 may, without consent, subcontract the provision of a Service, or a portion of a Service, provided that Level 3 will continue to be liable for the performance of such subcontractors in accordance with the terms of this Agreement.

5.13    Relationship; Third Parties and Counterparts. The relationship between the parties is not that of partners, agents, or joint venturers. Nothing in this Agreement shall confer upon any third party any right, benefit or remedy of any nature under this Agreement. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one instrument. Digital signatures and electronically exchanged copies of signed documents shall be sufficient to bind the parties to this Agreement.

5.14    Dispute    Resolution    Proceedings    Before    the    National    Regulatory    Authority ("*Bundesnetzagentur*"). If the Customer wishes to institute conciliation proceedings to settle any dispute between Level 3 and the Customer as to whether Level 3 has fulfilled its obligations vis-à-vis the Customer in accordance with the provisions of the German Telecommunications Act, the Customer may address a request to that effect to the Bundesnetzagentur in Bonn. Further details are available on the Website of Bundesnetzagentur: www.bundesnetzagentur.de.

5.15    Severability. If any provision of this Agreement shall be declared invalid or unenforceable under applicable law, said provision shall be ineffective only to the extent of such declaration and such declaration shall not affect the remaining provisions of this Agreement. In the event that a material and fundamental provision of this Agreement is declared invalid or unenforceable under applicable law, the parties shall negotiate in good faith respecting an amendment hereto that would preserve, to the fullest extent possible, the respective rights and obligations imposed on each party under this Agreement as originally executed.

| Level 3 Communications GmbH | Telegram Corp. |
|---|---|
| Signature: _(signature)_ | Signature: _(signature)_ |
| Name: _Nicholas Spence_ | Name: PAVEL DUROV |
| Title: EMEA General Counsel | Title: |
| Date: 22 June 2017 | Date: JUNE 21ST 2017 |

**Level(3)**
COMMUNICATIONS
Level 3 Communications GmbH
Rüsselheimer Straße 22
60326 Frankfurt am Main
Germany

SERVICE SCHEDULE
LEVEL 3 HIGH SPEED IP SERVICE

1.      **Applicability.** This Service Schedule forms part of the Master Service Agreement between Level 3 and Customer ("Agreement") and is applicable only where Customer orders Level 3 High Speed IP Service (the "Service"). Level 3 provisions the Service on two networks, identified as: AS 3356 (Level 3) and/or AS 3549 (Global Crossing). Level 3 High Speed IP Service may be designated as IP Transit Service or (3)CrossRoads Service in customer orders, order acceptance, service delivery, billing (and related) documents.

2.      **Definitions.** Any capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement. The following terms are defined for the purposes of this Service Schedule:

(A)     "Back-Up Port" shall mean any Level 3 High Speed IP Service port other than the Primary Port that is configured to send/receive traffic only in the event that the applicable Primary Port becomes unavailable to send or receive traffic. The Back-Up Port must be identified as such in the Customer Order and provisioned on a Level 3 router or switch (within the same Level 3 Facility) that is separate from the Primary Port.

(B)     "Committed Data Rate" shall mean the minimum data rate committed by Customer and set forth in the Customer Order (expressed in Megabits per second (Mbps)).

(C)     "IP Fiber Extension" shall mean a dark fiber local access solution for Level 3 High Speed IP Service between the Level 3 Gateway and the Customer Premises (or such other point of interconnection) in which unprotected IP service is delivered using Level 3 Facilities and Customer facilities, as mutually agreed between the parties. Level 3 shall, in its sole discretion, determine whether Customer may utilize an IP Fiber Extension under this Service Schedule, or must obtain dark fiber pursuant to a separate dark fiber Service Schedule to be executed by the parties.

(D)     "Primary Port" shall mean any Level 3 High Speed IP Service port that is configured to send/receive Customer's Level 3 High Speed IP Service traffic during normal network operations, as identified in the applicable Customer Order.

(E)     "Receive Traffic" shall mean traffic from any origination point that is received by Customer from the Level 3 network.

(F)     "Send Traffic" shall mean traffic from any origination point that is sent by Customer onto the Level 3 network.

3.      **Service Description.** Level 3 High Speed IP Service is an IP transit service (including dedicated IP access port(s)) providing access to the Level 3 IP network and the global Internet. The Service is available through Serial/POS and Ethernet interfaces. The Service is available in a "Standard" configuration or a "Protected" configuration. Standard Service is configured with a single Primary Port and no Backup Port. Protected Service is configured with both a Primary Port and a Backup Port.

4.      **Charges.** Customer may elect to be billed based on a Committed Data or at a Fixed Rate. The manner of billing selected will be set forth in each Customer Order.

(A)     Committed Data Rate charges for  the Service consist of four (4) components: (a) a non-recurring installation charge per port; (b) a monthly recurring port charge (if applicable); (c) a monthly recurring charge based on the Committed Data Rate; and (d) monthly usage charges to the extent usage in a particular month exceeds the Committed Data Rate.

The Committed Data Rate shall apply to either a particular Service port or in the aggregate to more than one Service ports provided hereunder, as stated in the applicable Customer Order(s) for such ports. The "Aggregate CDR" billing option (as defined below) is not available for all port interface speeds. The following shall apply (as applicable):

        (1)     If the Committed Data Rate applies to a particular Service port, Customer's per port usage of Service (both Send Traffic and Receive Traffic) across such port will be sampled every five (5) minutes for the previous five (5) minute period. At the end of the month, the top five percent (5%) of Send Traffic and Receive Traffic samples for such port shall be discarded. The higher of the resulting ninety-fifth (95th) percentile value for Send Traffic or Receive Traffic for such port will be compared to the Committed Data Rate applicable to the port. If the ninety-fifth (95th) percentile of either Send Traffic or Receive Traffic is higher than the applicable Committed Data Rate, Customer will, in addition to being billed for the Committed Data Rate, be billed at this ninety-fifth (95th) percentile level for any usage in excess of such Committed Data Rate at the contracted-for price per

Megabit.

(2)   If the Committed Data Rate applies in the aggregate to more than one Service ports (an "Aggregate CDR") as set forth in the Customer Order for such ports, Customer's usage of Service (both Send Traffic and Receive Traffic) will be sampled every five (5) minutes for the previous five (5) minute period for each such port. At the end of the month, the top five percent (5%) of Send Traffic and Receive Traffic samples shall be discarded for each port. The higher of the resulting 95th percentile value for Send Traffic or Receive Traffic for each such port will be added together to determine Customer's aggregate usage and such aggregate usage will be compared to the Aggregate CDR. If such aggregate usage is higher than the Aggregate CDR, Customer will, in addition to being billed for the Aggregate CDR, be billed for any aggregate usage in excess of the Aggregate CDR at the contracted-for price per Megabit. Unless otherwise agreed in writing by the parties, Aggregate CDRs apply only to the ports listed in the Customer Order. If Customer orders additional ports in a separate subsequent Customer Order(s), the Aggregate CDR stated in the new Customer Order shall be as stated therein for the ports set forth in such Customer Order. Alternatively, if Customer seeks to have the ports previously subject to an Aggregate CDR also contribute to the Aggregate CDR set forth in the new Customer Order(s), the new Customer Order(s) may provide for an increase in the Aggregate CDR for all such ports.

(B)   Fixed Rate charges for Service consist of two (2) components: (a) a non-recurring installation charge per port; and (b) a monthly recurring port charge.

5.   <u>IP Addresses and Domain Names</u>. In the event that Level 3 assigns to Customer an IP address as part of the provision of Service, such IP address shall (upon Level 3's request and to the extent permitted by law) revert to Level 3 after termination of the applicable Customer Order for any reason whatsoever, and Customer shall cease using such address. At any time after such termination, Level 3 may re-assign such address to another user. In the event that Level 3 obtains for Customer a domain name (which may be required in some European jurisdictions), Customer shall be the sole owner of such domain name. Customer shall be solely responsible for:

(A)   paying any fees (including renewal fees) relating thereto;

(B)   complying with any legal, technical, administrative, billing or other requirements imposed by the relevant domain name registration authority;

(C)   modifying the mapping of such domain name to a new provider in the event Customer changes service providers; and

(D)   all third party claims (including claims for intellectual property infringement) relating thereto, and Customer shall indemnify and hold Level 3 harmless from all such claims and expenses (including legal fees and court costs) related thereto.

6.   <u>IP Fiber Extensions</u>.

(A)   Pursuant to a Customer Order submitted by Customer and accepted by Level 3, the parties may agree that Level 3 will provide Customer with an IP Fiber Extension as part of the local access solution for any Service provided hereunder. Level 3 will invoice Customer, and Customer agrees to pay Level 3, the charges associated with any such IP Fiber Extension as set forth in the applicable Customer Order. Unavailability or degradation of Service caused by or attributable to IP Fiber Extensions shall be considered Excused Outages. The foregoing notwithstanding, Level 3 will use commercially reasonable efforts to respond to any such unavailability or degradation (on Level 3 Facilities) associated with any IP Fiber Extension within four (4) hours after becoming aware of the same and shall use commercially reasonable efforts to repair traffic-affecting discontinuity within twelve (12) hours after Level 3's representatives arrive at the problem site and have the ability to begin uninterrupted repair activities.

(B)   Level 3 shall have the right to supervise and control in a reasonable manner all activities concerning any IP Fiber Extension provided hereunder, including, without limitation, all Level 3 manholes/handholes. Any work required by Customer in respect of any IP Fiber Extension provided hereunder, including without limitation, (i) splicing the Customer fibers, and (ii) interconnection between the Customer network and the Level 3 network, shall be undertaken only by or (with Level 3's consent) under the supervision of Level 3.

(C)   Prior to delivery of any IP Fiber Extension, Level 3 shall test the dark fiber contained in such IP Fiber Extension in accordance with the then-current version of Level 3's interconnection policies and guidelines.

7.   <u>Service Levels</u>.

(A)   <u>Installation Service Level</u>. Level 3 will exercise commercially reasonable efforts to install any Service on or before the Customer Commit Date specified for the particular Service. This Installation Service Level shall not

apply to Customer Orders that contain incorrect information supplied by Customer or Customer Orders that are altered at Customer's request after submission and acceptance by Level 3. In the event Level 3 does not meet this Installation Service Level for a particular Service for reasons other than an Excused Outage, Customer will be entitled to a service credit for each day of delay equal to either (i) for Service billed on an Aggregate CDR basis, the charges for one (1) day of the pro rata share of the monthly recurring charges ("MRC") associated with the Aggregate CDR for the affected Service port(s) (pro-rated based on the number of total ports that contribute to such Aggregate CDR) or (ii) for Service with any other manner of billing, the charges for one (1) day of the allocated port MRC for the affected Service port(s), in each case up to a monthly maximum credit of ten (10) days.

(B)    Availability Service Level. The Availability Service Level for Standard Service is 99.98% and 99.99% for Protected Service. Standard Service is considered unavailable if the Primary Port is unable to send or receive traffic; Protected Service is considered unavailable if both the Primary Port and the Backup Port are unable to send or receive traffic. If credits are due under this Availability Service Level for a particular unavailability event, Service credits will not be payable under Section 7(C) or 7(D) for the same unavailability event.

In the event that Service becomes unavailable for reasons other than an Excused Outage, Customer will be entitled to a service credit off of the greater of (i) the port MRC (except for any Service billed on an Aggregate CDR basis) for the affected Service port (if applicable), and (ii) the actual usage charges, if any, (calculated on a Megabit basis at the contracted-for price per Megabit) associated with the affected Service port for the particular month. Service credits, in each case, are based on the cumulative unavailability of the affected Service port in a given calendar month as set forth in the following tables:

For Standard Service:

| Cumulative Unavailability (in hrs:mins:secs) | Service Level Credit |
|---|---|
| 00:00:01 – 00:10:00 | No Credit |
| 00:10:01 – 00:45:00 | 5% |
| 00:45:01 – 04:00:00 | 10% |
| 04:00:01 – 08:00:00 | 20% |
| 08:00:01 – 12:00:00 | 30% |
| 12:00:01 – 16:00:00 | 40% |
| 16:00:01 – 24:00:00 | 50% |
| 24:00:01 or greater | 100% |

For Protected Service:

| Cumulative Unavailability (in hrs:mins:secs) | Service Level Credit |
|---|---|
| 00:00:01 – 00:05:00 | No Credit |
| 00:05:01 – 00:45:00 | 15% |
| 00:45:01 – 04:00:00 | 35% |
| 04:00:01 – 08:00:00 | 50% |
| 08:00:01 – 12:00:00 | 75% |
| 12:00:01 or greater | 100% |

(C)    Delay (Latency). Level 3 commits to average (in a calendar month) latency between the Internet access routers of no more than the latency figures in the table below, depending on which network the Service is provided. If delay exceeds these objectives, except as the result of an Excused Outage, Customer will be entitled to a service credit off the port MRC for the affected Service port as set forth below:

Note: Although Level 3 has completed its acquisition of Global Crossing, the networks that each company operated have not been fully integrated and as such Services may be ordered and provisioned on either Legacy Level 3 network AS 3356 or Global Crossing network AS 3549. For Services provisioned on Level 3 network (AS3356), the delay measurement is calculated as an average one way latency between Internet routers within each region and between regions connected to AS 3356. For Services provisioned on Global Crossing network (AS 3549), the delay measurement is calculated as an average round trip latency between Internet routers within a region and between regions connected to AS 3549.

| Route | Level 3 AS 3356 (one-way) | Global Crossing AS 3549 (round –trip) |
|---|---|---|
| Within the North American Network [Intra-N. America] | < 25 ms | < 50 ms* |
| European Network to North American Network | < 40 ms | < 80 ms** |
| Within the European Network [Intra-Europe] | <15 ms | < 35 ms |
| Within the Asia Network [Intra-Asia] | N/A | < 110 ms |
| Within the LATAM Network [Intra-LATAM, excluding Mexico City] | N/A | < 120 ms |
| Asian Network to European Network | N/A | < 345 ms** |
| Asian Network to North American Network | N/A | < 185 ms** |
| Asian Network to LATAM Network [excluding Mexico City] | N/A | < 315 ms** |
| European Network to LATAM Network [excl. Mexico City] | N/A | < 210 ms** |
| North American Network to LATAM Network [excl. Mexico City] | N/A | < 140 ms** |
| European Network (South) to Middle East | ≤94 ms | N/A |

* Add 90 ms from/to the Mexico IP Hub on GC network.

** Plus the applicable latency parameter for the region in which the applicable Customer Site is located

| Delay Exceeding Objective | Service Level Credit |
|---|---|
| 1 – 10 ms | |
| | 10% |
| 10.1 – 25 ms | |
| | 30% |
| 25.1 ms or greater | |
| | 50% |

(D)     Packet Delivery. The packet delivery objective is 99.95%. Packet delivery is measured as the average number of IP packets transiting the Level 3 network that are delivered to the intended destination on the Level 3 network. Measurements are over a calendar month, and performance statistics for this SLA can be found on Level 3's customer portal. If packet delivery exceeds these objectives except as the result of an Excused Outage, Customer will be entitled to a service credit off of the port MRC for the affected Service port as set forth below:

| Packet Delivery below Objective | Service Level Credit |
|---|---|
| 99.949% - 99% | |
| | 10% |
| 98.99% - 96% | |
| | 30% |
| 95.99% or less | |
| | 50% |

8.     Chronic Outage. Customer may elect to terminate an affected Service prior to the end of the Service Term without termination liability if, for reasons other than an Excused Outage:

(1)     For Standard Service, such Standard Service is unavailable (as defined in Section 7(B) above) in any calendar month for: (a) three (3) or more separate occasions of more than twelve (12) aggregate hours each, OR (b) more than forty two (42) hours in the aggregate; or

(2)     For Protected Service, such Protected Service is unavailable (as defined in Section 7(B) above) in any calendar month for: (a) four (4) or more separate occasions of more than two (2) aggregate hours each, OR (b) more than twenty four (24) hours in the aggregate.

Customer may only terminate such Service that is unavailable as described above, and must exercise its right to terminate the affected Service under this Section, in writing, within thirty (30) days after the event giving rise to a right of termination hereunder, which termination will be effective as set forth by Customer in such notice of termination. Except for any credits that have accrued pursuant to Section 7, this Section 8 sets forth the sole remedy of Customer for chronic outages or interruptions of any Level 3 High Speed IP Service.

9.     Level 3 arranged Third Party Internet Access: Upon Customer's request, Level 3 may agree to arrange Internet access using third party providers ("Third Party Internet Access"). Access options vary by country and may include access to the Internet via overbooked and/or non-overbooked connections, DSL technology, private leased circuits (fixed or wireless) and/or Satellite. Specific service details (access type, e.g. downstream/upstream speed, customer premises equipment requirements and number of IP addresses) also differ by country. Third Party Internet Access will, if requested by Customer and accepted by Level 3, be provided by third party subcontractor(s) to Level 3; and, accordingly, is provided on an "as is" basis with the limited service level described below. Customer may report faults and/or outages in Third Party Internet Access to Level 3 on a 24x7 basis and Level 3 will contact the applicable third party service provider to effect restoration. Details of any agreed Third Party Internet Access (including pricing and equipment requirements, if any) will be set out in a Customer Order.

(A)     The Availability Service Level for Third Party Internet Access is 98.0%. For Third Party Internet Access (i) Service Availability is defined as the ability of Customer to deliver IP packets from Customer port to any Internet destination and (ii) Service unavailability is defined as periods during which Third Party Internet Access is unavailable. Service unavailability is calculated from the time Level 3 opens a trouble ticket on behalf of Customer until Level 3 closes such trouble ticket.

(B)     Service Level Credit. In the event that Third Party Internet Access becomes unavailable for reasons other than an Excused Outage, Customer will be entitled to a service credit as follows. For the first two hour period (or part thereof) of Service unavailability in excess of 14.9 hours, and for each successive one hour period or part thereof, Customer will be entitled to a credit of ten per cent (10.0%) of the applicable MRC for the applicable month. For the purpose of this Section, 'MRC' means the agreed monthly recurring charge for the Third Party Internet Access provided to the Customer which is the subject of the credit claim. The Service Level Credit stated in this Section 9(B) is Customer's sole remedy of Customer for unavailability or interruptions of any Third Party Internet Access.

10.     Resale Restriction. Notwithstanding anything to the contrary in the Agreement, Customer is prohibited from reselling any Level 3 High Speed IP Service or any ports provided pursuant to this Service Schedule as a stand-alone wholesale service to a third party without the express written consent of Level 3, provided, however

that Customer may bundle any Level 3 High Speed IP Service or any ports provided pursuant to this Service Schedule with any other Level 3 Services or the services of Customer and resell such bundled service to Customer's subscribers and its customers.

11.  **Latin American Services**. With respect to Services provided in Latin America, Customer agrees that it (or its local Affiliate) will enter into a separate local country addendum/agreement (as approved by local authorities) ("LCA") with the respective Level 3 Affiliate which provides the local Service(s), containing terms necessary to comply with local laws/regulations, and such Level 3 Affiliate will invoice the Customer (or its local Affiliate) party to the LCA for the respective local Service(s).

SERVICE SCHEDULE
<u>LEVEL 3 DATA CENTER FACILITY SERVICES</u>

1.      <u>Applicability</u>. This Service Schedule forms part of the Master Service Agreement between Customer and Level 3 ("Agreement"), and is applicable only where Customer orders Level 3® Data Center Facility Services and associated services. Data Center Facility Services may also be designated as Level 3 Colocation in customer orders, order acceptance, service delivery, billing (and related) documents. This Service Schedule is also applicable where Customer orders Level 3® Cross Connect Service and may be designated as Cross Connect Service (or Stand Alone Cross Connect Service) in Customer Orders, order acceptance, service delivery, billing (and related) documents.

2.      <u>Definitions and Service Description</u>. Any capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement. Level 3 offers 3 types of "Facilities" for data center colocation (which shall be identified in the Customer Order): Level 3 Premier Elite, Level 3 Premier Select, and Level 3 Premier. In all three types of Facilities, Customer may colocate and install telecommunications equipment and or equipment that manages customer information and applications such as IT computer equipment and servers.

"Colocation Area" shall mean the location within a Level 3 owned or leased Facility in which Space ordered by Customer is located.

"Space" shall mean the location(s) within the Colocation Area where Customer is permitted to colocate communications and networking equipment, as set forth in a Customer Order accepted by Level 3. The types of Space generally offered by Level 3 are (i) Cabinets – a single rack enclosure with locking front and rear doors generally located in a common area of the Colocation Area; and (ii) Private Suites – an area of floor space enclosed by mesh fence or steel partition walls containing cabinets and which is dedicated to a single customer.

"Cross Connect Service" or "Cross Connect" shall mean a copper or fiber optic cabling cross-connected between Level 3 provided Colocation (cabinets, racks, and/or suites), other Level 3 provided Service or Facilities and/or third party provided services or facilities that terminate within the Level 3 Colocation Facility.

"Hot Aisle Cold Aisle" shall mean the arrangement of Customer equipment where the equipment air intake is facing a common aisle ("Cold Aisle"), and the air exhaust of the equipment faces the alternate common aisle ("Hot Aisle"), as designated by Level 3.

"Colocation Environment" shall mean the allowable relative humidity range and maximum allowable temperature in the Colocation Area, specifically as differentiated between Data Center and Network Facilities as set forth in Exhibit A.

"Contracted Square Feet" or "Contracted Square Meter" shall mean, with respect to a Private Suite, the total floor space enclosed within and up to the caged walls of the Private Suite.

3.      <u>Usage Right</u>. Customer shall be granted the right to occupy the Space identified in an accepted Customer Order during the Service Term (unless earlier terminated as set forth herein or in the Agreement), subject to the applicable rates set forth in such Customer Order and in accordance with the Agreement and this Service Schedule. At the end of the Service Term, the Space will be provided to Customer on a month-to-month basis at Level 3's then-current prices that Customer agrees to pay by way of continued use of the Space. Level 3 retains the right to access Space for any legitimate business purpose at any time. Nothing herein creates or vests in Customer (or in any other person) any easement, ownership interest, or other property right or interest of any nature in any part of the Facilities, including the Space. Customer expressly disclaims any right, title or interest in, or any perpetual right to use, the Facilities, the Space, and any equipment or other property of Level 3 in the Facilities beyond the rights granted herein.

Customer equipment and third party equipment shall each comply with the Equipment Criteria, a copy of which will be provided to Customer upon request, and if required Customer shall on request demonstrate compliance to the satisfaction of Level 3. Customer shall ensure that Customer equipment and third party equipment are physically segregated, in a manner satisfactory to Level 3, from equipment of Level 3 and equipment of other equipment housing parties.

4.      <u>Use of and Access to Space</u>. Customer may only use the Service and the Space for its legitimate corporate business purposes. Placement of Customer equipment in the Space or use of the Service for any other purpose is strictly prohibited. Customer may access the Space 24 hours per day, 7 days per week, subject to any and all rules, regulations and access requirements imposed by Level 3 governing such access at each Facility. At certain locations pre-arranged escorted access may be required.

Access policies and procedures (including procedures for emergency access) vary between Facilities, and will be

set out in a Service Manual / Welcome Package which will be provided by Level 3 in respect of each Space in which Level 3 provides the Services to Customer.

If Customer contracts for installation or maintenance by a third party, Customer shall notify Level 3 in writing of the identity of and authorization for its third party. Approval of a nominated third party is within the absolute discretion of Level 3. If approved, the provision of access to such third party maintenance providers shall be subject to these terms and conditions and the applicable Service Manual / Welcome Package / Facility User Guide and safety, security and access rules of Level 3.

5.        Level 3 Maintenance. Level 3 shall perform janitorial services, environmental systems maintenance, power plant maintenance and other actions as are reasonably required to maintain the Colocation Area in a condition that is suitable for the placement of communications and networking equipment. Level 3 shall maintain the Colocation Environment applicable to the Colocation Facility at all times. Level 3 shall in no event be liable for damages pursuant to Sec.536a of the German Civil Code ("Bürgerliches Gesetzbuch – BGB") that have not been caused culpably ("schuldhaft"). Customer shall install equipment in a Hot Aisle Cold Aisle configuration. Customer shall maintain the Space in an orderly and safe condition, and shall return the Space to Level 3 at the conclusion of the Service Term in the same condition (reasonable wear and tear excepted) as when such Space was delivered to Customer. Customer shall not be entitled to any self rectification with respect to any defects of the Service or the Colocation Area. EXCEPT AS EXPRESSLY STATED HEREIN OR IN ANY CUSTOMER ORDER, THE SPACE SHALL BE DELIVERED AND ACCEPTED "AS IS" BY CUSTOMER, AND NO RESPRESENTATION HAS BEEN MADE BY LEVEL 3 AS TO THE FITNESS OF THE SPACE FOR CUSTOMER'S INTENDED PURPOSE.

6.        Release of Landlord. If and to the extent that Level 3's underlying leases so require (but only if they so and lawfully require) Customer hereby agrees to release Level 3's landlord (and its agents, subcontractors and employees) from all liability relating to Customer's access to the Colocation Area (and the Facility in which it is located) and Customer's use and/or occupancy of the Colocation Space. Level 3's acceptance of a Service Order by Customer for Data Center Facility Services is consequently subject to the condition precedent of obtaining such release.

7.        Security. Level 3 will provide and maintain in working condition card readers, scanners and/or other access devices as selected by Level 3 for access to the Colocation Area. Customer shall under no circumstances bypass the Level 3 security measures for the Facility, Colocation Area or Space. Level 3 will provide a locking mechanism for the Facility, Colocation Area or Space, and Customer shall be solely responsible for locking and/or activating such mechanism, except for Level 3 access pursuant to Clause 3. In the event that unauthorized parties gain access to any Level 3 facility through access cards, keys or other access devices provided to Customer, Customer shall be responsible for any damages caused by such parties, unless Customer can prove that he cannot be held accountable ("Vertretenmüssen") for such damages. Customer shall be responsible for the cost of replacing any security devices lost or stolen after delivery thereof to Customer.

8.        Rules and Procedures. Customer shall abide by any posted or otherwise communicated rules including, but not limited to those policies, procedures, and guidelines made available to, posted, or described in the Level 3 Facilities User Guide, Service Manual / Welcome Package / Facility User Guide relating to the use of, access to, or security measures respecting each Level 3 facility.

9.        Termination of Use. Level 3 shall have the right to terminate Customer's use of the Space and/or the Service delivered therein in the event that:
(a) Level 3's rights to use the facility in which the Space is located terminates
(b) Customer is in default hereof, including a default in payment by the Customer with a considerable amount;
(c) Customer makes any material alterations to the Space without first obtaining the written consent of Level 3;
(d) Customer allows personnel or contractors access to the Level 3 facilities who have not been approved by Level 3 in advance; or
(e) Customer or any of its agents or employees possess any firearms, illegal drugs or alcohol in a facility or engage in any criminal activity in any facility.
With respect to items (b), (c) and (d), unless (in Level 3's opinion) Customer's actions interfere or have the potential to interfere with other Level 3 customers (in which case termination may be immediate), Level 3 shall take reasonable and commercially prudent steps to provide Customer a written notice and a 10 day opportunity to cure before terminating Customer's rights to use the Space, notwithstanding any longer cure period set forth in the Agreement.

10.        Removal of Equipment. Within 10 days following the expiration or termination of the Service Term for any Space, subject to a lien exercised by Level 3, Customer shall remove all Customer equipment or third party equipment from the Space. In the event Customer fails to remove the equipment within such 10 day period, Level 3 may disconnect, remove and dispose of such equipment upon further prior notice of five (5) days. Level 3 may charge Customer and Customer shall pay Level 3's reasonable expenses related to the retention, removal, abandonment or disposal of the Customer equipment and any third party equipment. Customer shall be

responsible for any costs and expenses incurred by Level 3, or its agent, representative or contractor, resulting from disconnection, removal, disposal and storage of Customer's or third party's equipment. Level 3 shall not be obligated to release equipment to Customer unless Customer has paid all such costs and expenses and all other charges due and owing by Customer to Level 3 under the Agreement. Level 3 shall not be liable for any loss or damage incurred by Customer arising out of Level 3's disconnection, removal, storage or disposal of Customer's or third party's equipment that has been carried out in accordance with this Clause 10, except where the equipment has been damaged by Level 3's willful acting or gross negligence.

11.     Sublease. Customer may sublease the use of Space under the following conditions:
(a) all proposed subleases must be approved in advance and in writing by Level 3 in Level 3's sole discretion, except Customer may sublease the use of Space to an Affiliate of Customer upon prior written notice to Level 3;
(b) all proposed sublessees shall abide by the terms of the Agreement, this Service Schedule and the applicable Customer Order;
(c) Customer shall indemnify, defend and hold Level 3 harmless from all loss or damage suffered by Level 3, including claims brought against Level 3 arising from any act or omission of any sublessees or its agents; and
(d) the acts and omissions of any sublessees of Customer shall be attributable to Customer for the purposes of the Agreement and this Service Schedule.

Each client, supplier or other contract partner of Customer is regarded to be an agent or representative of the Customer, all actions and omissions of such third party as well as the use of the Collocation Space or of the Services provided within the framework of this Agreement by such third party shall be attributed to the Customer. Granting rights of use to third parties does not release the Customer from his obligations according to the Agreement.

In the event Customer subleases use of the Space without Level 3's prior written approval, Level 3 may upon ten (10) days' prior written notice, reclaim the subleased portion of the Space. Customer shall surrender such reclaimed Space and shall be subject to termination charges associated with the reclaimed Space as provided in the Agreement. No refunds shall be made to Customer regarding reclaimed Space.

The placement by Customer of hardware or other equipment (Server Housing) of third parties as well as web hosting by Customer for third parties, who themselves do not have access to the Collocation Space, does not count as the granting of rights of use to third parties within the meaning of this clause.

12.     Changes. Level 3 reserves the right (at Level 3's cost) to change the location or configuration of the Space used by Customer, provided that Level 3 shall not arbitrarily require such changes. Level 3 and Customer shall work in good faith to minimize any disruption in Customer's services that may be caused by such changes in location or configuration of the Space. In the event that Level 3 makes a change to the Space itself that materially and directly impacts Customer's current Collocation Services Customer may terminate the affected Collocation Services without liability. In the event any Customer Order is altered (including, without limitation, any changes in the configuration or build-out of the Space) at Customer's request after Customer's submission and Level 3's acceptance of such Customer Order that results in a delay of Level 3's delivery of such Space, billing for such Space shall commence no later than the original Customer Commit Date.

13.     Insurance. Prior to occupancy by Customer of any Space and during the Service Term, Customer shall procure and maintain the following minimum insurance coverage:
(a) Workers' Compensation in compliance with all applicable statutes of appropriate jurisdiction;
(b) Commercial General Liability with combined single limits of EUR1,000,000 each occurrence; and
(c) "All Risk" Property insurance covering all personal property located by the Customer in the Collocation Area.
Customer acknowledges that it retains the risk of loss for, loss of (including, without limitation, loss of use), or damage to, equipment and other personal property located by or on behalf of the Customer in a Level 3 facility, except the case that Level 3 is liable for such a loss or damage according to Article 4 of the Agreement.
Customer further acknowledges that Level 3's insurance policies do not provide coverage for personal property located by or on behalf of the Customer in a Level 3 facility.
Customer shall furnish Level 3 (or Level 3's written designee) with certificates of insurance demonstrating that Customer has obtained the required insurance coverage prior to use of any Level 3 facility. Such certificates shall contain a statement that the insurance coverage shall not be materially changed or cancelled without at least 30 days' prior written notice to Level 3.
Customer shall require any contractor, customer or other third party entering the Collocation Area on Customer's behalf to procure and maintain the same types, amounts and coverage extensions as required of Customer above.

14.     Storage of Customer Equipment. Level 3 may, at its option, agree to store equipment that Customer intends to colocate in Customer's Space for not more than 45 days prior to the applicable Customer Commit Date. Storage of such equipment is purely incidental to the Service ordered by Customer and Level 3 will not charge Customer a fee for such storage. No document delivered as part of such storage shall be deemed a warehouse receipt. Absent Level 3's gross negligence, intentional misconduct or liability pursuant to Article 4 of the Agreement, Level 3 shall have no liability to Customer or any third party arising from such storage and Customer shall indemnify Level 3 for any claims relating to the same. In the event Customer stores equipment for longer than 45 days, Level 3 may, but shall not be obligated to, return Customer's equipment to Customer without

liability, at Customer's sole cost and expense.

15.     Promotional Signage. Customer may display a single promotional sign with Customer's name and/or logo on the outside of any Space; provided such signage does not exceed 20 centimeters by 28 centimeters. All other promotional signage is prohibited.

16.     Cross Connect Services.

(A)     Customer shall be solely responsible for arranging the provision of any services required from any third party with whom it wishes to interconnect. Customer Commit Dates may not be provided for Level 3 Cross Connect Service, in which case service delivery shall constitute Level 3's acceptance.

(B)     Interconnection. Unless otherwise agreed between the parties, any Level 3 Cross Connect Service will be interconnected to a Level 3 provided panel within the Level 3 Facility (and not directly to Customer provided equipment or facilities). Upon request of Customer at the time of submission of the applicable Customer Order, Level 3 will interconnect such Level 3 Cross Connect Service directly to Customer provided equipment or facilities within the Level 3 Facility; provided, however, Level 3 shall not be liable to Customer or any third party for any loss or damage to such Customer provided equipment or facilities arising out of such direct interconnection, except for damages caused by Level 3's intentional misconduct or gross negligence.

(C)     If for any reason any underlying Service associated with a Level 3 Cross Connect Service is terminated (including by expiry of its applicable Service Term without any renewal), Customer shall, within fifteen (15) days of termination or expiry of the underlying Service, take all reasonable steps to effect an orderly disconnection of the Level 3 Cross Connect Service, including but not limited to withdrawing, terminating and/or revoking any applicable Circuit Facility Assignment ("CFA") obtained through a local access provider. If Customer fails to do so within the specified time limit, Customer hereby (i) authorizes Level 3 to disconnect the applicable third party local access circuit(s) from its Network and to instruct the local access provider on Customer's behalf to remove the CFA from Level 3's shared or dedicated facilities and (ii) agrees to reimburse Level 3 for any ongoing charges levied by the local access provider until the local access circuit and any CFA is removed.

17.     Power.

(A)     Power is charged on a breakered amp load basis, a metered usage basis, or a kilowatt basis and on the basis of the prices charged by the power utility. In the event the power utility increases the price paid by Level 3 for power provided to any Space, Level 3 may pass-through to Customer such price increase upon written notice to Customer.

(B)     The maximum supportable power density in each Data Center facility is identified in Exhibit A. Any additional power is subject to prior written approval by Level 3, in Level 3's sole discretion, and may be conditioned on additional terms and conditions. If Customer exceeds the applicable maximum supportable power density level for 1 consecutive hour or more and Customer does not reduce (and thereafter continually maintain) its power consumption at a level below the maximum supportable power density within 5 days of written notice by Level 3, then Level 3 may, at its option, increase the monthly recurring charges payable by Customer for the affected Space (to a rate determined by Level 3) or immediately terminate Customer's use of the Space. The above notwithstanding, if Customer's power consumption in excess of the applicable maximum supportable power density creates, in Level 3's reasonable opinion, an unsafe or hazardous environment (including threatening the safe, continued operation of any part of the Colocation Area) then Level 3 may immediately suspend providing power to Customer until Customer has cured the issue and provided Level 3 adequate assurances that such issues will not recur. Where possible and reasonable under the relevant circumstances, Level 3 will try to inform Customer prior to such suspension.

(C)     Subject to the prior written approval of Level 3, including approval of the subject equipment, design and manner of installation, Customer may provide a rack mounted UPS unit to provide conditioned AC power. Level 3 assumes no responsibility for the operation or performance of this equipment, Customer has sole liability therefor, and any Service Levels or SLAs are not applicable.

18.     Service Levels.

The following Service Levels describe scope and quality of the Services provided by Level 3 hereunder and the provisions on service credits for not meeting the Service Levels replace any statutory rights of Customer to reduce the charges for the Service.

(A)     Colocation Installation Service Level. Level 3 will exercise commercially reasonable efforts to install any Space on or before the Customer Commit Date specified for such Space. This Installation Service Level shall not apply to Customer Orders that contain incorrect information supplied by Customer, Customer Orders that are altered at Customer's request after submission and acceptance by Level 3, or Customer Orders that require

Level 3 to configure Space to specifications other than Level 3's standard specifications for Space (such standard specifications shall be made available to Customer upon request). In the event Level 3 does not meet this Installation Service Level for a particular Space for reasons other than an Excused Outage, Customer will be entitled to a service credit equal to the charges for one (1) day of the MRC for the affected Space for each day of delay, up to a monthly maximum credit of four (4) days.

(B)      Cross Connect Installation Service Level. Level 3 will exercise commercially reasonable efforts to install any Level 3 Cross Connect Service on or before the Customer Commit Date specified if any for the particular Level 3 Cross Connect Service. This Installation Service Level shall not apply to Customer Orders that contain incorrect information supplied by Customer or Customer Orders that are altered at Customer's request after submission and acceptance by Level 3. In the event Level 3 does not meet this Installation Service Level for a particular Level 3 Cross Connect Service for reasons other than an Excused Outage, Customer will be entitled to a service credit off of the non-recurring charges ("NRC") and/or monthly recurring charges ("MRC") for the affected Level 3 Cross Connect Service as set forth in the following table:

For Level 3 Cross Connect Service:

| Installation Delay Beyond Customer Commit Date | Service Level Credit |
|---|---|
| 1 – 5 business days | Amount of NRC |
| 6 – 20 business days | Amount of NRC plus charges for one (1) day of the MRC for each day of delay |
| 21 + business days | Amount of NRC plus one (1) month's MRC |

(C)      Power Service Level. In the event of any outage of Level 3 provided conditioned power (power provided with UPS or DC battery backup systems) to the Space for reasons other than an Excused Outage, Customer will be entitled to a service credit equal to a percent of the MRC for the affected Space based on the cumulative unavailability for the affected Space in a given calendar month as set forth in the following table):

| Cumulative Unavailability (in hrs:mins:secs) | Level 3 Provided Conditioned AC or DC Power Service Level Credit stated as a credit equal to a % of MRC |
|---|---|
| 00:00:01 – 00:05:00 | 2.5% |
| 00:05:01 – 00:45:00 | 5% |
| 00:45:01 – 04:00:00 | 10% |
| 04:00:01 – 08:00:00 | 20% |
| 08:00:01 –12:00:00 | 30% |
| 12:00:01 –16:00:00 | 40% |
| 16:00:01 – 24:00:00 | 50% |
| 24:00:01 or greater | 100% |

Any Level 3 provided unconditioned power (i.e. power provided without Level 3 operated UPS or DC battery backup systems and/or power solely conditioned by customer provided UPS systems known as "House Power") is not covered under this or any Service Level Agreement. This means that Level 3 shall owe to the Customer only the effort to maintain power supply as provided by and obtained from the relevant power utility.

19.     Applicable Law and Local Country Agreements. Notwithstanding anything to the contrary in the Agreement, the construction, interpretation and operation of these terms and conditions shall be governed (i) in the case of Facilities in the United States, by the laws of the State of New York and (ii) in the case of Facilities located outside the United States, by the laws of the country in which the applicable Facility is located. With respect to Service provided in certain jurisdictions outside the United States (if any), if requested by Level 3, Customer agrees that it (or its local affiliate) will enter into a separate local country addendum/agreement (as provided by local authorities) ("LCA") with the respective Level 3 affiliate that provides the local Service(s) and such Level 3 affiliate will invoice the Customer (or its local affiliate) party to the LCA for the respective local Service(s).

20. Value Added Tax. If, in any jurisdiction in which Level 3 provides Space to Customer, the usage right in paragraph 3 above is regarded as the letting or leasing of immovable property for value added tax ("VAT") purposes and the applicable VAT legislation allows the parties to elect to waive the exemption and charge VAT, then Level 3 and Customer agree to elect to waive the exemption and fulfil all necessary actions and arrangements to meet the requirements of the applicable law to validate such election. In addition, Exhibit B sets out specific VAT requirements for Germany and Italy and Exhibit B shall apply to all Customer Equipment placed in any such jurisdiction.

EXHIBIT A

ENVIRONMENT LEVELS

| Facility | Maximum and Minimum Humidity Levels | Maximum Temperature Levels* |
|---|---|---|
| Premier Elite | 30% to 70% | 78 °F (26 °C) |
| Premier Select/Premier | 20% to 80% | 85 °F (29.5°C) |

* Measured 6'6" (78 inches or 1.98 meters) above the finished floor, and 8" (0.203 meter) in front of Customer equipment on the Cold Aisle.

MAXIMUM SUPPORTABLE POWER DENSITY

Maximum Power Density for Private Suites

| Facility | Maximum Watts per Square Meter [1] [EMEA / LatAm] | Maximum Watts per Rack inside a Suite [2] [EMEA / LatAm] | Maximum Watts per Square Foot [1] [NA] | Maximum Watts per Rack inside a Suite [2] [NA] |
|---|---|---|---|---|
| Premier Elite | 750 | 5,000 | 200 | 10,000 |
| Premier Select / Premier | 500 | 2,000 | 75 | 5,000 |

[1] Maximum Watts per Square Meter or Maximum Watts per Square Foot is measured as the total watts of power within a Private Suite that Customer can safely use (draw) at a static point in time, divided by the total number of Contracted Square Meters or Contracted Square Foot in the Private Suite.

[2] Maximum Watts per Rack is measured as the total watts of power to a specific Rack within a Private Suite that Customer can use (draw) at a static point in time in that specific Rack as long as the overall power use of the Private Suite does not exceed the stated maximum watts per square foot or maximum watts per square meter, as applicable.

Maximum Power Density for Stand Alone Cabinets

| Facility | Maximum Watts per Cabinet [NA / EMEA / LatAm] [1] |
|---|---|
| Premier Elite | 10,000 / 6,000 / 5,000 |
| Premier Select / Premier | 5,000 / 6,000 / 3,000 |

[1] Maximum Watts per Stand Alone Cabinet is measured as the total watts of power to a specific Cabinet that Customer can use (draw) at a static point in time in that specific Cabinet.

EXHIBIT B

SPECIFIC JURISDICTION REQUIERMENTS FOR VAT

"VAT" means (i) in the UK, value added tax as provided for in the Value Added Tax Act 1994 (as amended or re-enacted in each case from time to time) and legislation supplemental thereto; ii) in other Member States of the European Union, the tax levied in any relevant Member State pursuant to Council Directive 2006/112/EC of 28 November 2006 on the common system of value added tax (as amended); and (iii) in any jurisdiction that is not a Member State, any Value Added Tax or equivalent tax; in any of these cases, at the rate in force when the relevant supply is made, and includes any tax of a similar nature substituted for, or levied in addition to such value added tax.

In accordance with the Agreement, the charges and fees are exclusive of applicable taxes, which are to be paid by Customer. This Exhibit contains guidance on taxes in Germany and Italy; this Exhibit applies only to Customer equipment placed in such jurisdictions.

Germany. For colocation services in Germany, reference is made to Sec. 4 Nr. 12 and Sec. 9 of the German VAT Code ("Umsatzsteuergesetz"). The Customer shall only use the premises of Level 3 for turnover which does not preclude Level 3's right to deduct value added tax and shall without undue delay inform Level 3 of any and all circumstances which might affect such right. The Customer shall provide to Level 3, upon request, all documents necessary to enable Level 3 to fulfill its information duties towards the tax authorities under Sec. 9 para. 2 of the German VAT Code.

Italy: Contratto soggetto ad IVA a seguito di espressa opzione del locatore ai sensi dell'art. 10, n. 8), del D.P.R. 26 ottobre 1972, n. 633 ("Agreement subject to VAT following explicit option by the lessor, pursuant to Article 10, No. 8), of Presidential Decree No. 633 of October 26, 1972")"

## ADDENDUM TO MASTER SERVICE AGREEMENT

This Addendum to Master Service Agreement dated 22 July 2014 ("Addendum") is made by and between Telegram Corp., Global Bank Tower, 18th Floor, 50th Avenue, P.O. Box 552484, Paitilla, Panama City, Panama, RUC 2036711-1-745739 ("Customer")

and

Level 3 Communications GmbH, Rüsselheimer Strasse 22, 60326 Frankfurt am Main, Germany (registered at Amtsgericht Frankfurt am Main under HRB 43850, USt-IdNr. DE 195 395 583) ("Level 3"),

hereinafter referred to separately as a "Party" and jointly "Parties".

1. The Parties agreed that Clause 2.2 of Master Service Agreement of 22 July 2014 shall be fully replaced with the following:

"2.2     Payment of Invoices and Disputes. Invoices are delivered monthly to the MyLevel 3 Portal and should be paid by the Customer within (five) 5 days after an invoice becomes available to the Customer. It is Customer's responsibility to (i) register onto the MyLevel3 Portal for access to their invoices, (ii) ensure email contact addresses are up to date and (iii) to check invoice availability. Fixed charges are billed in advance and usage-based charges are billed in arrears. Billing for partial months is prorated. Past due amounts bear interest at 1.5% per month or the highest rate allowed by law (whichever is less). Customer is responsible for all charges in respect of the Service attributable to him, even if incurred as the result of unauthorized use. If Customer reasonably disputes an invoice, Customer must pay the undisputed amount and submit written notice of the disputed amount (with details of the nature of the dispute and the Services and invoice(s) disputed). Disputes must be submitted in writing within 90 days from the date of the invoice. If the dispute is resolved against Customer, Customer shall pay such amounts plus interest from the date originally due."

2. All other terms and conditions set forth in the Master Service Agreement shall remain in full force and effect, except as modified by the terms of this Addendum.

3. This Addendum shall come into effect upon its' signature by both Parties.

IN WITNESS WHEREOF, the parties have entered into this Addendum as of the Addendum Effective Date written above.

Level 3 Communications GmbH

Signature: _____

Name: _____

Title: EMEA General Counsel

Date: 22 June 2017

**Level(3)**
COMMUNICATIONS
Level 3 Communications GmbH
Rüsselheimer Straße 22
60326 Frankfurt am Main
Germany

Telegram Corp.

Signature: _____

Name: PAVEL DUROV

Title: _____

Date: JUNE 21st 2017

# Exhibit D



## NOVATION AGREEMENT

THIS NOVATION AGREEMENT is made this _12th_ day of _February_ 2017 2018

**BETWEEN**:

1. **CenturyLink Communications Germany GmbH** (formerly CenturyLink Communications GmbH), (registered at the Amtsgericht Frankfurt am Main with company no. HRB 43850) whose registered office is at Rüsselsheimer Straße 22, 60326 Frankfurt am Main ("CenturyLink"); and

2. **Telegram Corp.**, (RUC 2036711-1-745739) whose registered office is at Global Bank Tower, 18th Floor, 50th Avenue, P.O. Box 55 2484, Patilla, Panama City, Panama (the "Original Customer"); and

3. **Global Network Management Ltd.**, (reg. No. 1557620) whose registered office is at Road Town, PO Box 146, Tortola, British Virgin Islands (the "Successor Customer").

**WHEREAS**:

A. Taking into account Letter of Agreement between Level 3 Communications GmbH, Original Customer and Telegram Messenger LLP, CenturyLink and the Original Customer are parties to Customer Orders specified in the Schedule attached hereto (such Customer Orders referred to herein as the "Orders"); and

B. The Original Customer desires to be discharged from the further performance of the Original Customer's obligations under the Orders and CenturyLink is willing to comply with such request upon terms that the Successor Customer shall undertake to perform such obligations and be bound by the terms of the Orders in lieu of the Original Customer.

**IT IS HEREBY AGREED** as follows:

1. With effect from **the 01st of the month following at least 30 days from the date of receipt by CenturyLink of this Agreement signed by the Customers** (the "Effective Date"), CenturyLink hereby releases the Original Customer from its obligations under the Orders (without prejudice to any antecedent breaches) and the Successor Customer hereby undertakes to CenturyLink to perform identical obligations and be bound by the Orders as if the Successor Customer had been named a party thereto in lieu of the Original Customer.

2. In consideration of the Successor Customer assuming all of the Original Customer's obligations under the Orders, the Original Customer's rights, interests and benefits arising after the Effective Date under the Orders shall be terminated and identical rights, interests and benefits shall arise in favour of the Successor Customer.

3. As of the Effective Date, terms and conditions set forth in a Master Service Agreement between CenturyLink or CenturyLink Affiliate and the Successor Customer shall apply to the Orders. In the absence of such Master Service Agreement Orders shall be governed by CenturyLink standard Master Service Agreement. Notwithstanding anything in the standard CenturyLink Master Service Agreement, by signing this Novation Agreement the Successor Customer accepts that invoices for Service are delivered monthly to the CenturyLink Portal and should be paid by the Customer within (five) 5 days after an invoice becomes available to the Customer. It is Customer's responsibility to (i) register onto the Portal for access to their invoices, (ii) ensure email contact addresses are up to date and (iii) to check invoice availability.

4. From and after the Effective Date all references to the Original Customer in the Orders shall be deemed to be references to the Successor Customer.

5. Nothing in this Novation Agreement shall affect or prejudice any claim or demand whatsoever which either CenturyLink or the Original Customer may have against the other relating to matters arising prior to the Effective Date.



**Level (3)**

6. This Novation Agreement shall only become operative on signature of all the parties hereto.

7. This Novation Agreement shall be governed by and construed in accordance with the laws of Germany, and the parties agree to submit to the exclusive jurisdiction of the courts of Frankfurt am Main.

8. If any provision of this Novation Agreement shall be declared invalid or unenforceable under applicable law, said provision shall be ineffective only to the extent of such declaration and such declaration shall not affect the remaining provisions of this Agreement. In such event, the parties shall negotiate in good faith respecting an amendment hereto that would preserve, to the fullest extent possible, the respective rights and obligations imposed on each party under this Agreement as originally executed.

Signed by for and of behalf of
**Telegram Corp.**

Signature:

Name:   Vladimir Vedeneev

Title:   CFO

Date: 12.02.2018

Signed by for and of behalf of
**Global Network Management Ltd.**

Signature:

Name:   Vladimir Vedeneev

Title:   CEO

Date:   12.02.2018

Signed by for and of behalf of
**CenturyLink Communications Germany GmbH**

Signature:

Name:   *Beatrice Wesp*

Title:   *Senior Corporate Counsel*

Date:   14.02.2018

**CenturyLink**

CenturyLink Communications Germany GmbH
Rüsselsheimer Straße 22
30326 Frankfurt am Main



### SCHEDULE

This is the Schedule referred to in the attached Novation Agreement between CenturyLink Communications Germany GmbH and the Original and Successor Customers referred to therein.

The Orders entered into between CenturyLink and the Original Customer are as follows:

1. Customer Order Form No. 000521553 dated July 14th, 2015
2. Customer Order Form No. 000521551 dated July 14th, 2015
3. Customer Order Form No. 000521552 dated July 14th, 2015
4. Customer Order Form No. 000525115 dated February 2nd, 2016

# Exhibit E

**Level(3)**
COMMUNICATIONS

## NOVATION AGREEMENT

**THIS NOVATION AGREEMENT** is made the _____ day of _____ 2018

**BETWEEN:**

1. **Level 3 Latin American Solutions LLC**, whose registered office is at 701 Wateford Way, Suite 390, Miami, FL (33126) ("Level 3 U.S."); and

2. **Telegram Corp.**, (RUC 2036711-1-745739) whose registered office is at Global Bank Tower, 18th Floor, 50th Avenue, P.O. Box 55 2484, Patilla, Panama City, Panama (the "Original Customer"); and

3. **Global Network Management Ltd.**, (reg. No. 1557620) whose registered office is at Road Town, PO Box 146, Tortola, British Virgin Islands (the "Successor Customer").

**WHEREAS:**

A. Level 3 and the Original Customer are parties to the agreement(s) specified in the Schedule attached hereto (such agreements referred to herein as the "Agreement(s)"); and

B. The Original Customer desires to be discharged from the further performance of the Original Customer's obligations under the Agreement(s) and Level 3 is willing to comply with such request upon terms that the Successor Customer shall undertake to perform such obligations and be bound by the terms of the Agreement(s) in lieu of the Original Customer.

**IT IS HEREBY AGREED** as follows: -

1. With effect from **the 01st of the month following at least 30 days from the date of receipt by Level 3 U.S. of this Agreement signed by the Customer** (the "Effective Date"), Level 3 hereby releases the Original Customer from its obligations under the Agreement(s) (without prejudice to any antecedent breaches) and the Successor Customer hereby undertakes to Level 3 to perform identical obligations and be bound by the Agreement(s) as if the Successor Customer had been named a party thereto in lieu of the Original Customer.

2. In consideration of the Successor Customer assuming all of the Original Customer's obligations under the Agreement(s), the Original Customer's rights, interests and benefits arising after the Effective Date under the Agreement(s) shall be terminated and identical rights, interests and benefits shall arise in favour of the Successor Customer.

3. From and after the Effective Date all references to the Original Customer in the Agreement(s) shall be deemed to be references to the Successor Customer.

4. Nothing in this Novation Agreement shall affect or prejudice any claim or demand whatsoever which either Level 3 or the Original Customer may have against the other relating to matters arising prior to the Effective Date.

5. This Novation Agreement shall only become operative on signature of all the parties hereto.

6. This Novation Agreement shall be governed by and construed in accordance with the laws of England and Wales, and the parties agree to submit to the exclusive jurisdiction of the courts of England and Wales.

| Signed by for and of behalf of **Level 3 Latin American Solutions LLC** | Signed by for and of behalf of **Telegram Corp.** | Signed by for and of behalf of **Global Network Management Ltd** |
|---|---|---|
| By: | By: | By: |
| Name: FEDERICO LAMMEL | Name: Vladimir Vedeneev | Name: Vladimir Vedeneev |
| Title: Apoderado | Title: CFO | Title: CEO |
| Date: Feb 16, 2018 | Date: 14.02.2018 | Date: 14.02.2018 |



**Level (3)**

## SCHEDULE

This is the Schedule referred to in the attached Novation Agreement between Level 3 Latin American Solutions LLC and the Original and Successor Customers referred to therein.

The Agreement(s) entered into between Level 3 Communications and the Original Customer are as follows:

1. U.S. Addendum dated March 6th, 2015
2. Customer Order No. 1824195 dated July 25th, 2014
3. Customer Order No. 2142210 dated February 2nd, 2015
4. Customer Order No. dated March 30th, 2015
5. Customer Order No. 2481380 dated June 29th, 2015
6. Customer Order No. 2751178 dated October 10th, 2015
7. Customer Order No. 4568619 dated August 31st, 2016



# Exhibit F

ITExpress Corporation
2077 N. Capitol Ave.
San Jose, CA 95132

Tel: 408-957-8448

INVOICE# 022185

CUSTOMER# GLO210-K82357

**BILL TO:**
GLOBAL NETWORK MANAGEMENT LTD.
FLOOR 2, TRIDENT TRUST BUILDING
WICKHAMS GAY PO BOX 146
ROAD TOWN, TORTOLA, VIRGIN IS.

Tel: 781-26765050
Resale#:  FAX: 781-26765051
20:34

**SHIP TO:**       FED#667952603/
GLOBAL NETWORK MANAGEMENT LTD.
11407 SWE AMU ST, STE # 66701

TUALATIN, OR 97062

INV,    JLI   SSHAN shipped from SJ
*SI*0/99999:01/01/19
1356,1 07/15

| SHIP DATE | SHIP VIA | | F.O.B. | | TERMS | |
|---|---|---|---|---|---|---|
| 07/10/18 | FED-PRIORITY-COLLE | | ITExpress, Corp | | TT - WIRE XFER | |

| PURCHASE ORDER NUMBER | | ORDER DATE | SALES PERSON | | | OUR ORDER NUMBER |
|---|---|---|---|---|---|---|
| EM09102018 | | 07/10/18 | ELLA  x229 | | 162 | -113 |

| QUANTITY | | | ITEM | DESCRIPTION | UNIT | EXTENDED |
|---|---|---|---|---|---|---|
| QTY.REQ. | SHIPPED | B.O. | NUMBER | | PRICE | PRICE |
| 1380 | 1380 | 0 | D42632G4S2 | M393A4K40CB2-CTD 2666  32G ER | 517.00 | 713460.00 |
| 1 | 1 | 0 | XXXX | SHIPPING | | |

```
* PLEASE CONTACT YOUR ACCOUNT MANAGER FOR CURRENT PROMOTIONS.
* AN AUTOMATIC FINANCE CHARGE AT A RATE OF 1% MONTHLY
* IS GENERATED BY OUR SYSTEM FOR EACH INVOICE THAT IS OVERDUE.
* THESE CHARGES ARE GENERATED ON A MONTHLY BASIS.
* Index credit is applied to HDDS return within 7 Days from invoice.
* Please see updated RMA policy.
```

| | | |
|---|---|---|
| Non Taxable | 0.00 | |
| * Taxable | 713460 .00 | |
| 0.000% Sales Tax | 0.00 | |
| Invoice Total | 713460.00 | |

Page 1/1          Printed: 07/10/18-20:34